UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATE OF AMERICA,

     Plaintiff,                        Case No.: 2:18-mc-51801

v.                                 Hon. Denise Page Hood

MASHIYAT RASHID,

     Defendant.

_____/

## CHAPTER 7 TRUSTEE CHARLES J. TAUNT'S ANCILLARY PETITION FOR DETERMINATION OF RIGHTS TO PROPERTY

Charles J.  Taunt, Chapter 7 Trustee for thee Bankruptcy Estate of Saima Rashid, states as follows:

1.  This is an Ancillary Petition for determination of rights to property in a related case, 2:17-cr-20465-DPH-RSW-1, USA vs. Rashid (the "Rashid Criminal Case").

2.  This Court has jurisdiction over this Petition pursuant to 21 U.S.C. §853(n) and Fed. R. Crim. P. 32.

3.  Saima M. Rashid is the spouse of defendant Mashiyat Rashid.

4.  Charles J. Taunt is the Chapter 7 Trustee for the Bankruptcy Estate of Saima M. Rashid, Case No. 18-46255-MAR (Bankr. ED MI).  A copy of the Notice appointing the Trustee is attached as **Exhibit 1**.

5.  On November 20, 2018, this Court entered a preliminary order of forfeiture in the Rashid Criminal Case (ECF #317 in the Rashid Criminal Case).

6.  On November 21, 2018, the United States first published a notice of the forfeiture on the forfeiture.gov website.

7.  On November 23, 2018, notice of this forfeiture order was served by US mail (regular and certified) on the Trustee based on a proof of service (ECF #318 in the Rashid Criminal Case).   This notice was received by the Trustee on November 28, 2018.

8.  In the various forfeiture notices, the following assets (collectively, the "Assets") are pertinent to the instant Petition:

| # | Asset ID | Asset Description |
|---|----------|-------------------|
| 1 | 17-FBI-005339 | All Funds on Deposit and All Other Items of Value from E*Trade IRA Account No. XXXX0075 ($25,568.16) |
| 2 | 17-FBI-005344 | All Funds on Deposit and All Other Items of Value in U.S. Trust-Bank of America Private Wealth Management Account No. XX-XX-XXX-XXX4026 ($6,764,801.27) |
| 3 | 17-FBI-005355 | $64,680.04 in funds from Bank of America Account No. XXXX-XXXX-3302 |
| 4 | 17-FBI-005356 | $3,650,413.21 in funds from Bank of America Money Market Savings Account No. XXXX-XXX-8653 |
| 5 | 17-FBI-006090 | $508,400.00 U.S. Currency |

9.  Mrs. Rashid had an interest in each of the Assets identified above at the time she filed a bankruptcy petition under Chapter 7 on April 27, 2018.  As such, her

2

interest in the Assets are property of her bankruptcy estate pursuant to 11 U.S.C. §541.

10. Mrs. Rashid had an interest in each of the Assets for the reasons described below.

11. As to the Accounts in items 2, 3, and 4, she was a 50% joint title holder on the accounts.  See attached documentation (**Exhibits 2, 3, and 4**).

12. As to the 508,400.00 U.S. Currency asset (Item 5), $500,000 of these funds were seized, upon information and belief, immediately after they were withdrawn from Bank of America Account #8653 (a joint account).  A copy of the account statement identifying this withdrawal is attached as **Exhibit 4**.

13. The Trustee has a good faith belief that the source of the funds seized by the government that make up  the Assets, at least in part, are the proceeds of an approximate $2 million loan from Bank of America, of which Mrs. Rashid was a borrower/maker.   Copies of documents establishing this loan are attached as Exhibit 5, indicating that the loan proceeds (a line of credit) would be deposited to Bank of America Account #3302 (a joint Account).

14. Because the Assets (along with assets of the defendant) were seized by the United States, Mrs. Rashid could not repay the Bank of America loan when it came due, Bank of America obtained a judgment against her, and she was required to file for bankruptcy.

15. As to the IRA (Item #1), the Trustee has no information other than that which was provided by the Government in the forfeiture notices, naming Ms. Rashid as a joint title holder. However, her legal interest in this account may be superior to the Government.

16. The foregoing facts are verified under oath by the Trustee in a Claim form he submitted to the Government along with each of the exhibits attached hereto. This verified statement is incorporated herein and attached as Exhibit 6.

17. The Trustee is a fiduciary appointed to investigate the assets and financial affairs of Mrs. Rashid. His knowledge of these facts are based upon a review of documentation submitted by Mrs. Rashid and testimony obtained in the bankruptcy case.

18. The Trustee's investigation continues into these matters. As further information becomes available, he will supplement this Petition as necessary. The Trustee asks that the Court allow sufficient time for him

Wherefore, the Trustee asks that this Court determine the property rights of the Trustee, for an on behalf of the bankruptcy estate of Saima Rashid, in the Assets

4

**THE TAUNT LAW FIRM**

By:/s/ Dean R. Nelson, Jr.
Dean R. Nelson, Jr. (P70818)
Attorney for Charles J.  Taunt
700 East Maple Road, Second Floor
Birmingham, MI  48009
(248) 644-0950
Dated: December 21, 2018        dnelson@tauntlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATE OF AMERICA,

      Plaintiff,                       Case No.: 2:18-mc-51801

v.                                   Hon. Denise Page Hood

MASHIYAT RASHID,

      Defendant.

_____/

**CERTIFICATE OF SERVICE**

I certify that on December 21, 2018, I electronically filed the Chapter 7 Trustee Charles J. Taunt's **Ancillary Petition for Determination of Rights of Property** and this **Certificate of Service** via the Court's ECF system which will give notice to the following ECF participants:

Dean R. Nelson , Jr    dnelson@tauntlaw.com, sdewitte@tauntlaw.com


Gerald J. Gleeson , II    gleeson@millercanfield.com, giovannangeli@millercanfield.com, rouman@millercanfield.com

Jacob Foster    jacob.foster@usdoj.gov, fra.hcf.ecf@usdoj.gov, Marie.krieger@usdoj.gov, mary.winn@usdoj.gov, William.Golden.IV@usdoj.gov

Malisa Chokshi Dubal    malisa.dubal@usdoj.gov, fra.hcf.ecf@usdoj.gov, marie.krieger@usdoj.gov, mary.winn@usdoj.gov, William.Golden.IV@usdoj.gov

Shankar Ramamurthy    shankar.ramamurthy@usdoj.gov, CaseView.ECF@usdoj.gov, terence.oconnell@usdoj.gov

THE TAUNT LAW FIRM


By:/s/ Dean R. Nelson, Jr.
Attorney for Chapter 7 Trustee
700 East Maple Road, Second Floor
Birmingham, MI 48009
(248) 644-7800
dnelson@tauntlaw.com
(P70818)

Exhibit 1

**Information to identify the case:**

| | | |
|---|---|---|
| Debtor 1 | **Saima M. Rashid** | Social Security number or ITIN **xxx–xx–4780** |
| | First Name   Middle Name   Last Name | EIN  _ _–_ _ _ _ _ _ _ |
| Debtor 2 (Spouse, if filing) | First Name   Middle Name   Last Name | Social Security number or ITIN  _ _ _ _ |
| | | EIN  _ _–_ _ _ _ _ _ _ |
| United States Bankruptcy Court   **Eastern District of Michigan** | | Date case filed for chapter **7**   **4/27/18** |
| Case number:   **18–46255–mar** | | |

## Official Form 309A (For Individuals or Joint Debtors)
## Notice of Chapter 7 Bankruptcy Case –– No Proof of Claim Deadline     12/15

For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.

This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtors or the debtors' property. For example, while the stay is in effect, creditors cannot sue, garnish wages, assert a deficiency, repossess property, or otherwise try to collect from the debtors. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. Under certain circumstances, the stay may be limited to 30 days or not exist at all, although debtors can ask the court to extend or impose a stay.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at   www.pacer.gov).

The staff of the bankruptcy clerk's office cannot give legal advice.

To help creditors correctly identify debtors, debtors submit full Social Security or Individual Taxpayer Identification Numbers, which may appear on a version of this notice. However, the full numbers must not appear on any document filed with the court.

Do not file this notice with any proof of claim or other filing in the case. Do not include more than the last four digits of a Social Security or Individual Taxpayer Identification Number in any document, including attachments, that you file with the court.

The court will dismiss this case without a hearing if the debtor(s) do not timely file all the required documents and if no request for a hearing on dismissal is filed within 21 days after the petition is filed. The Clerk will give notice of the hearing on dismissal only to the party requesting the hearing, the debtor and the trustee.

| | | About Debtor 1: | | About Debtor 2: |
|---|---|---|---|---|
| 1. | **Debtor's full name** | Saima M. Rashid | | |
| 2. | **All other names used in the last 8 years** | | | |
| 3. | **Address** | 5591 Walnut Ridge Ct West Bloomfield, MI 48322 | | |
| 4. | **Debtor's attorney** Name and address | David Alexander Pernick Booth Patterson PC 4139 W. Walton Blvd. Suite F Waterford, MI 48329 | | Contact phone: (248) 681–1200 |
| 5. | **Bankruptcy trustee** Name and address | Charles Taunt 700 East Maple Road Second Floor Birmingham, MI 48009 | | Contact phone: 248–647–1127 |

**For more information, see page 2 >**

Debtor **Saima M. Rashid**                                                    Case number **18–46255–mar**

| 6. Bankruptcy clerk's office | Address of the Bankruptcy Clerk's Office: | For the Court: |
|---|---|---|
| Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or register online at www.pacer.gov. | 211 West Fort Street<br>Detroit, MI 48226<br><br>Contact phone: 313–234–0065 | Clerk of the Bankruptcy Court:<br>Katherine B. Gullo<br><br>Hours open:<br>8:30am–4:00pm Monday–Friday<br><br>Date: 4/27/18 |
| **7. Meeting of creditors** | **June 6, 2018 at 10:30 AM** | Location: |
| Debtors must attend the meeting to be questioned under oath. In a joint case, both spouses must attend. Creditors may attend, but are not required to do so. | The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | **211 West Fort St., Room 315, Detroit, MI 48226** |
| **8. Presumption of abuse** | The presumption of abuse does not arise. | |
| If the presumption of abuse arises, you may have the right to file a motion to dismiss the case under 11 U.S.C. § 707(b). Debtors may rebut the presumption by showing special circumstances. | | |
| **9. Deadlines**<br><br>The bankruptcy clerk's office must receive these documents and any required filing fee by the following deadlines. | **File by the deadline to object to discharge or to challenge whether certain debts are dischargeable:**<br><br>**You must file a complaint:**<br>• if you assert that the debtor is not entitled to receive a discharge of any debts under any of the subdivisions of 11 U.S.C. § 727(a)(2) through (7), or<br><br>• if you want to have a debt excepted from discharge under 11 U.S.C § 523(a)(2), (4), or (6).<br><br>**You must file a motion:**<br>• if you assert that the discharge should be denied under § 727(a)(8) or (9). | **Filing deadline: 8/6/18** |
| | **Deadline to object to exemptions:**<br>The law permits debtors to keep certain property as exempt. If you believe that the law does not authorize an exemption claimed, you may file an objection. | **Filing deadline:** 30 days after the *conclusion* of the meeting of creditors |
| **10. Proof of claim**<br><br>Please do not file a proof of claim unless you receive a notice to do so. | No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |
| **11. Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. | |
| **12. Exempt property** | The law allows debtors to keep certain property as exempt. Fully exempt property will not be sold and distributed to creditors. Debtors must file a list of property claimed as exempt. You may inspect that list at the bankruptcy clerk's office or register online at www.pacer.gov. If you believe that the law does not authorize an exemption that the debtors claim, you may file an objection. The bankruptcy clerk's office must receive the objection by the deadline to object to exemptions in line 9. | |

Exhibit 2



PO BOX 830269
DALLAS TX  75283-0269

UA                    075 404 004274 #@03 SP 0.510
MASHIYAT & SAIMA RASHID
5591 WALNUT RIDGE CT
W BLOOMFIELD MI 48322-2090

20180501SPNH0000927300001 Sheet 1 of 12

Trade Date

Trust Operations
PO Box 830269
Dallas, TX 75283

## U.S. TRUST

Bank of America Private Wealth Management

### Account Statement

This Statement Covers
Apr. 01, 2018 through Apr. 30, 2018

MASHIYAT & SAIMA RASHID
5591 WALNUT RIDGE CT
W BLOOMFIELD MI 48322-2090

| Table of Contents | Page |
| --- | --- |
| Summary By Account | 3 |
| Account Summary | 4 |
| Portfolio Analysis | 6 |
| Portfolio and Activity Detail | 8 |
| Important Disclosures | 21 |

*Account Name:*    BANK OF AMERICA, N.A.
CONSOLIDATED ACCOUNT
MASHIYAT & SAIMA RASHID
RELATIONSHIP

*Account Number:*    ■■■■■■4026

*Investment Policy Statement Objective:*    No Investment Responsibility

*Portfolio Manager:*
John A Capuano 248.631.0539

*Write:*
Trust Operations
PO Box 830269
Dallas, TX 75283

### Messages

**Register for Paperless Statements Today! It's convenient, faster and environmentally friendly.**

If you already view your statements online, you may also register for paperless statements at www.fs.ustrust.com.

After login, go to the **Statements** tab and click **Change delivery preferences.** Then simply select the eligible statement cycles you wish to suppress from paper delivery.

If you would like to enroll in online access and choose paperless statements, please contact your advisor or call 1.800.U.S.TRUST (1.800.878.7878).

Go Green! Switch to paperless statements on USTrust.com today.
Go online or contact your advisor for more information.

Page 1 of 22



**U.S. TRUST**

Bank of America Private Wealth Management

*** This Page Intentionally Left Blank ***

05/01 02 506

Trade Date



**U.S. TRUST**

Bank of America Private Wealth Management

*Account:* ▮▮▮▮▮▮4026    MASHIYAT & SAIMA RASHID COMBINED

**Summary by Account**
Apr. 01, 2018 through Apr. 30, 2018

| Summary by Account | | Current Period | | | Year to Date | |
|---|---|---|---|---|---|---|
| *Sub-Account Number* | *Sub-Account Name* | *Account Value Beginning 04/01/2018* | *Account Value Ending 04/30/2018* | *Change in Account Value Since 04/01/2018* | *Account Value Beginning 01/02/2018* | *Change in Account Value Since 01/02/2018* |
| 56-01-100-3333986 | IM MASHIYAT & SAIMA RASHID | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 56-01-100-3334018 | IM M & S RASHID - LBS - PLDG | 6,730,376.04 | 6,743,833.03 | 13,456.99 | 6,719,028.83 | 24,804.20 |
| **Combined Account Total:** | | **$6,730,376.04** | **$6,743,833.03** | **$13,456.99** | **$6,719,028.83** | **$24,804.20** |

Market Value includes accrued income unless otherwise noted.

Page 3 of 22



20180501SPNH0000927300001 Sheet 3 of 12    05/01 02 506

Trade Date

# U.S. TRUST
Bank of America Private Wealth Management

**Account Summary**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026 MASHIYAT & SAIMA RASHID COMBINED

## Market Value $6,743,833.03

### Account Activity

| Description | Current Period | YTD Since 01/02/18 |
|---|---|---|
| **Beginning Market Value** | $6,730,376.04 | $6,719,028.83 |
| Income | 8,326.50 | 52,275.41 |
| Change in Market Value | 5,130.49 | -27,471.21 |
| **Ending Market Value** | **$6,743,833.03** | **$6,743,833.03** |
| Change in Account Value | 13,456.99 | 24,804.20 |

### Realized Gain/Loss Summary

| Description | Current Period | Fiscal YTD |
|---|---|---|
| Short term | $0.00 | $0.00 |
| Long-term | -627.87 | -501.79 |
| **Net Total** | **-$627.87** | **-$501.79** |

### Income Summary

| Description | Current Period | YTD since 01/02/18 |
|---|---|---|
| Dividends - Taxable | $3,046.50 | $8,975.90 |
| Interest - Taxable | 3,032.92 | 31,731.88 |
| Other Income | 2,247.00 | 11,567.63 |
| **Total Income** | **$8,326.50** | **$52,275.41** |

### Portfolio Allocation

| Description | Market Value | Tax Cost | Estimated Annual Income | Current Yield |
|---|---|---|---|---|
| Cash/Currency | $3,101,327.78 | $3,097,584.65 | $50,490.63 | 1.63% |
| Fixed Income | 3,642,506.25 | 3,648,654.75 | 89,822.50 | 2.48 |
| **Total Assets** | **$6,743,834.03** | **$6,746,239.40** | **$140,313.13** | **2.09%** |
| Liabilities | -1.00 | -1.00 | 0.00 | |
| **Total** | **$6,743,833.03** | **$6,746,238.40** | **$140,313.13** | |



Cash/Currency 46.0%
Fixed Income 54.0%

05/01 02 506

Trade Date

**U.S. TRUST** ⟨logo⟩

Bank of America Private Wealth Management

*Account:* ▓▓▓▓▓▓4026  MASHIYAT & SAIMA RASHID COMBINED

### Account Summary
Apr. 01, 2018 through Apr. 30, 2018

### Cash Summary

| | Current Period | YTD Since 01/02/18 |
|---|---|---|
| **Beginning Value** | **$0.00** | **$0.00** |
| Income | 8,326.50 | 52,275.41 |
| Sales and Maturities | 375,000.00 | 1,250,000.00 |
| Net Automated Money Market Transactions | -383,326.50 | -1,302,275.41 |
| **Ending Value** | **$0.00** | **$0.00** |



Trade Date

## U.S. TRUST

Bank of America Private Wealth Management

**Portfolio Analysis**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026 MASHIYAT & SAIMA RASHID COMBINED

### Portfolio Summary by Asset Class

| Description | Market Value | % of Account | % of Sector | Tax Cost | Estimated Annual Income | Current Yield |
|---|---|---|---|---|---|---|
| **Cash/Currency** | | | | | | |
| Cash Equivalents | $3,101,327.78 | 46.0% | 100.0% | $3,097,584.65 | $50,490.63 | 1.63% |
| **Total Cash/Currency** | **$3,101,327.78** | **46.0%** | **100.0%** | **$3,097,584.65** | **$50,490.63** | **1.63%** |
| **Fixed Income** | | | | | | |
| Investment Grade Taxable | $3,020,703.90 | 44.8% | 82.9% | $3,021,190.42 | $75,997.50 | 2.53% |
| International Developed Bonds | 621,802.35 | 9.2 | 17.1 | 627,464.33 | 13,825.00 | 2.23 |
| **Total Fixed Income** | **$3,642,506.25** | **54.0%** | **100.0%** | **$3,648,654.75** | **$89,822.50** | **2.48%** |
| **Total Assets** | **$6,743,834.03** | **100.0%** | | **$6,746,239.40** | **$140,313.13** | **2.09%** |
| **Liabilities** | **-$1.00** | | | **-$1.00** | **$0.00** | |
| **Total** | **$6,743,833.03** | | | **$6,746,238.40** | **$140,313.13** | |

05/01 02 506

Trade Date

## U.S. TRUST
Bank of America Private Wealth Management

**Portfolio Analysis**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████4026   MASHIYAT & SAIMA RASHID COMBINED

### Fixed Income - Maturity Schedule

| Maturity | Maturity Amount | % of Total |
|---|---|---|
| Less than 1 year | $2,526,000.00 | 69.7% |
| 1 - 5 years | 1,100,000.00 | 30.3 |
| **Total** | **$3,626,000.00** | **100.0%** |

| | |
|---|---|
| Weighted Average Maturity | 0.8 years |
| Weighted Average Coupon | 2.5% |
| Weighted Average Current Yield | 2.5% |
| Weighted Average Yield to Maturity/Call | 2.8% |

### Fixed Income - Quality Schedule

| Moody's Rating | Market Value | % of Fixed Income |
|---|---|---|
| Aa | $276,742.58 | 7.6% |
| A | 1,830,484.12 | 50.3 |
| Other Rated | 1,459,836.63 | 40.1 |
| Non-Rated | 75,442.92 | 2.1 |
| **Total Fixed Income** | **$3,642,506.25** | **100.0%** |

*The Fixed Income - Maturity Schedule and Fixed Income - Quality Schedule include cash equivalents maturing within six months and exclude preferred stocks and fixed income funds.*

20180501SPNH0000927300001 Sheet 5 of 12    05/01 02 506



Trade Date

# U.S. TRUST

Bank of America Private Wealth Management

## Portfolio Detail
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account:* ██████4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| **Cash/Currency** | | | | | | | | |
| **Cash Equivalents** | | | | | | | | |
| 0.000 | BANK OF AMERICA TEMPORARY OVERNIGHT DEPOSIT | 99Z490460 | $0.00 | $16.30 | $0.00 | $0.00 | $0.00 | 0.00% |
| 3,097,584.650 | FIDELITY GOVERNMENT PORTFOLIO INSTITUTIONAL CLASS | 31607A703 | 3,097,584.65 | 3,726.83 | 3,097,584.65 1.000 | 0.00 | 50,490.63 | 1.63 |
| | **Total Cash Equivalents** | | **$3,097,584.65** | **$3,743.13** | **$3,097,584.65** | **$0.00** | **$50,490.63** | **1.63%** |
| **Total Cash/Currency** | | | **$3,097,584.65** | **$3,743.13** | **$3,097,584.65** | **$0.00** | **$50,490.63** | **1.63%** |
| **Fixed Income** | | | | | | | | |
| **Investment Grade Taxable** | | | | | | | | |
| | **2018** | | | | | | | |
| 150,000.000 | GENERAL ELEC CAP CORP MTN DTD 04/21/08 5.625% DUE 05/01/18 Moody's: A2  S&P: A | 36962G3U6 | $150,000.00 100.000 | $4,218.75 | $150,000.00 100.000 | $0.00 | $8,437.50 | 5.62% 5.62 |
| 75,000.000 | ENTERPRISE PRODS OPER LLC SR UNSECD NT DTD 05/07/15 1.650% DUE 05/07/18 Moody's: BAA1  S&P: BBB+ | 29379VBG7 | 74,988.75 99.985 | 598.12 | 74,931.75 99.909 | 57.00 | 1,237.50 | 1.65 2.11 |
| 75,000.000 | ABBVIE INC UNSECD SR NT DTD 05/14/15 1.800% DUE 05/14/18 Moody's: BAA2  S&P: A- | 00287YAN9 | 74,988.00 99.984 | 626.25 | 75,104.89 100.140 | -116.89 | 1,350.00 | 1.80 2.25 |

*(1) Market Value in the Portfolio Detail section does not include Accrued Income*

Page 8 of 22

05/01 02 506

Trade Date



## U.S. TRUST
Bank of America Private Wealth Management

**Portfolio Detail**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▓▓▓▓4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account:* ▓▓▓▓4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| **Fixed Income (cont)** | | | | | | | | |
| **Investment Grade Taxable (cont)** | | | | | | | | |
| 125,000.000 | BANK NEW YORK INC UNSECD MEDIUM TERM SR NT CALL 4/22/18 @100 DTD 05/29/15 1.600% DUE 05/22/18 Moody's: A1  S&P:  A | 06406HDB2 | 124,948.75 99.959 | 883.33 | 125,288.78 100.231 | -340.03 | 2,000.00 | 1.60 2.23 |
| 75,000.000 | NORTHROP GRUMMAN CORP SR UNSECD NT DTD 05/31/13 1.750% DUE 06/01/18 Moody's: BAA2  S&P:  BBB+ | 666807BF8 | 74,961.75 99.949 | 546.87 | 75,158.51 100.211 | -196.76 | 1,312.50 | 1.75 2.31 |
| 75,000.000 | PPL CAP FDG INC SR UNSECD NT CALL 5/1/18 @100 DTD 05/24/13 1.900% DUE 06/01/18 Moody's: BAA2  S&P:  BBB+ | 69352PAG8 | 74,965.50 99.954 | 593.74 | 75,059.90 100.080 | -94.40 | 1,425.00 | 1.90 2.42 |
| 75,000.000 | DUKE ENERGY CORP NEW SR UNSECD NT CALL 05/15/18 @100 DTD 06/13/13 2.100% DUE 06/15/18 Moody's: BAA1  S&P:  BBB+ | 26441CAK1 | 74,958.00 99.944 | 594.99 | 75,138.19 100.184 | -180.19 | 1,575.00 | 2.10 2.52 |
| 75,000.000 | WISCONSIN ENERGY CORP SR UNSECD NT DTD 06/10/15 1.650% DUE 06/15/18 Moody's: A3  S&P:  BBB+ | 976657AJ5 | 74,933.25 99.911 | 467.49 | 75,121.18 100.162 | -187.93 | 1,237.50 | 1.65 2.34 |
| 75,000.000 | ENERGY TRANSFER PARTNERS L P SR UNSECD NT DTD 03/28/08 6.700% DUE 07/01/18 Moody's: BAA3  S&P:  BBB- | 29273RAH2 | 75,477.00 100.636 | 1,675.00 | 75,943.19 101.258 | -466.19 | 5,025.00 | 6.65 2.89 |

Page 9 of 22



Trade Date



**U.S. TRUST**

Bank of America Private Wealth Management

**Portfolio Detail**

Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▮▮▮▮4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ▮▮▮▮018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| Fixed Income (cont) | | | | | | | | |
| **Investment Grade Taxable (cont)** | | | | | | | | |
| 75,000.000 | KRAFT HEINZ FOODS CO UNSECD SR NT DTD 07/02/16 2.000% DUE 07/02/18 Moody's: BAA3  S&P: BBB | 50077LAG1 | 74,931.75 99.909 | 495.83 | 75,033.22 100.044 | -101.47 | 1,500.00 | 2.00 2.49 |
| 150,000.000 | PACCAR FINL CORP UNSECD MEDIUM TERM SR NT DTD 08/14/15 1.750% DUE 08/14/18 Moody's: A1  S&P: A+ | 69371RM60 | 149,734.50 99.823 | 561.45 | 150,447.02 100.298 | -712.52 | 2,625.00 | 1.75 2.34 |
| 75,000.000 | CAPITAL ONE NATL ASSN MCLEAN VA UNSECD SR NT CALL 7/17/18 @100 DTD 08/18/15 2.350% DUE 08/17/18 Moody's: BAA1  S&P: BBB+ | 14042E5V8 | 74,968.50 99.958 | 362.29 | 75,227.54 100.303 | -259.04 | 1,762.50 | 2.35 2.47 |
| 101,000.000 | HOME DEPOT INC SR UNSECD NT CALL 08/10/18 @100 DTD 09/10/13 2.250% DUE 09/10/18 Moody's: A2  S&P: A | 437076BB7 | 100,940.41 99.941 | 321.93 | 101,625.41 100.619 | -685.00 | 2,272.50 | 2.25 2.40 |
| 125,000.000 | TORONTO DOMINION BK UNSECD MEDIUM TERM BK NT CANADA DTD 09/10/13 2.625% DUE 09/10/18 Moody's: AA2  S&P: AA- | 89114QAM0 | 125,105.00 100.084 | 464.84 | 125,680.81 100.545 | -575.81 | 3,281.25 | 2.62 2.37 |
| 75,000.000 | REGIONS BK BIRMINGHAM ALA UNSECD SR NT 3/A2 CALL 08/14/18 @100 DTD 07/31/15 2.250% DUE 09/14/18 Moody's: BAA2  S&P: A- | 759187BL0 | 74,886.00 99.848 | 220.31 | 75,034.25 100.046 | -148.25 | 1,687.50 | 2.25 2.64 |

05/01 02 506

Trade Date



**U.S. TRUST**

Bank of America Private Wealth Management

**Portfolio Detail**

Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ████████4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| Fixed Income (cont) | | | | | | | | |
| **Investment Grade Taxable (cont)** | | | | | | | | |
| 75,000.000 | SUNTRUST BKS INC SR UNSECD NT CALL 10/01/18 @100 DTD 10/25/13 2.350% DUE 11/01/18 Moody's: BAA1  S&P: BBB+ | 867914BF9 | 74,933.25 99.911 | 881.25 | 75,323.55 100.431 | -390.30 | 1,762.50 | 2.35 2.52 |
| 100,000.000 | LOCKHEED MARTIN CORP SR UNSECD NT DTD 11/23/15 1.850% DUE 11/23/18 Moody's: BAA1  S&P: BBB+ | 539830BJ7 | 99,638.00 99.638 | 811.94 | 100,533.05 100.533 | -895.05 | 1,850.00 | 1.85 2.47 |
| 75,000.000 | CVS CAREMARK CORP UNSECD SR NT CALL 11/05/18 @100 DTD 12/05/13 2.250% DUE 12/05/18 Moody's: BAA1  S&P: BBB | 126650CB4 | 74,827.50 99.770 | 684.38 | 75,607.68 100.810 | -780.18 | 1,687.50 | 2.25 2.66 |
| | **2019** | | | | | | | |
| 75,000.000 | KROGER CO SR UNSECD NT CALL 12/15/18 @100 DTD 12/23/13 2.300% DUE 01/15/19 Moody's: BAA1  S&P: BBB | 501044CW9 | 74,772.00 99.696 | 507.92 | 75,510.14 100.680 | -738.14 | 1,725.00 | 2.30 2.75 |
| 75,000.000 | SYNCHRONY FINL SR UNSECD NT CALL 12/15/18 @100 DTD 12/04/15 2.600% DUE 01/15/19 Moody's: NA  S&P: BBB- | 87165BAJ2 | 74,868.75 99.825 | 574.17 | 75,194.84 100.260 | -326.09 | 1,950.00 | 2.60 2.80 |
| 125,000.000 | GOLDMAN SACHS GROUP INC UNSECD NT DTD 01/31/14 2.625% DUE 01/31/19 Moody's: A3  S&P: BBB+ | 38145XAA1 | 124,992.50 99.994 | 829.43 | 126,014.74 100.812 | -1,022.24 | 3,281.25 | 2.62 2.65 |



20180501SPNH0000927300001 Sheet 7 of 12      05/01 02 506

Trade Date

**U.S. TRUST** 

Bank of America Private Wealth Management

**Portfolio Detail**

Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ██████4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| Fixed Income (cont) | | | | | | | | |
| **Investment Grade Taxable (cont)** | | | | | | | | |
| 75,000.000 | MORGAN STANLEY UNSECD SR GMTN DTD 01/27/16 2.450% DUE 02/01/19 Moody's: A3  S&P: BBB+ | 61746BDX1 | 74,914.50 99.886 | 459.37 | 75,455.58 100.607 | -541.08 | 1,837.50 | 2.45 2.54 |
| 125,000.000 | JPMORGAN CHASE & CO UNSECD SR NT CALL 02/22/19 @100 DTD 03/23/16 1.850% DUE 03/22/19 Moody's: A3  S&P: A- | 46625HQU7 | 124,140.00 99.312 | 250.52 | 125,260.79 100.209 | -1,120.79 | 2,312.50 | 1.86 2.59 |
| 75,000.000 | NEWELL RUBBERMAID INC SR UNSECD NT DTD 03/30/16 2.600% DUE 03/29/19 Moody's: BAA3  S&P: BBB- | 651229AT3 | 74,696.25 99.595 | 173.33 | 75,566.94 100.756 | -870.69 | 1,950.00 | 2.61 3.07 |
| 200,000.000 | FIFTH THIRD BK CINCINNATI OHIO UNSECD MEDIUM TERM SR BK NT CALL DTD 04/25/14 2.375% DUE 04/25/19 03/25/19 @100 Moody's: A3  S&P: A- | 31677QBB4 | 199,564.00 99.782 | 79.17 | 201,162.11 100.581 | -1,598.11 | 4,750.00 | 2.38 2.61 |
| 150,000.000 | APPLE INC UNSECD SR NT DTD 05/06/14 2.100% DUE 05/06/19 Moody's: AA1  S&P: AA+ | 037833AQ3 | 149,641.50 99.761 | 1,531.24 | 151,987.02 101.325 | -2,345.52 | 3,150.00 | 2.10 2.34 |
| 75,000.000 | AMERICAN INTL GROUP INC SR UNSECD NT CALL 06/16/19 @100 DTD 07/16/14 2.300% DUE 07/16/19 Moody's: BAA1  S&P: BBB+ | 026874CZ8 | 74,368.50 99.158 | 503.12 | 75,294.94 100.393 | -926.44 | 1,725.00 | 2.32 3.03 |

05/01 02 506

Trade Date



**U.S. TRUST**

Bank of America Private Wealth Management

**Portfolio Detail**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████4026  MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account:* ████4018  IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| **Fixed Income (cont)** | | | | | | | | |
| **Investment Grade Taxable (cont)** | | | | | | | | |
| 75,000.000 | KINDER MORGAN INC DEL SR UNSECD NT CALL 11/01/19 @100 DTD 11/26/14 3.050% DUE 12/01/19 Moody's: BAA3  S&P: BBB- | 49456BAE1 | 74,759.25 99.679 | 953.12 | 76,010.69 101.348 | -1,251.44 | 2,287.50 | 3.06 3.18 |
| 150,000.000 | UNITEDHEALTH GROUP INC SR UNSECD NT DTD 12/08/14 2.300% DUE 12/15/19 Moody's: A3  S&P: A+ | 91324PCG5 | 148,965.00 99.310 | 1,303.33 | 152,285.11 101.523 | -3,320.11 | 3,450.00 | 2.31 2.84 |
| | **2020** | | | | | | | |
| 75,000.000 | CAPITAL ONE NATL ASSN MCLEAN VA SR UNSECD BD C12/31/19 @100 DTD 01/31/17 2.350% DUE 01/31/20 Moody's: BAA1  S&P: BBB+ | 14042RFH9 | 73,821.75 98.429 | 445.52 | 75,047.07 100.063 | -1,225.32 | 1,762.50 | 2.38 3.22 |
| 75,000.000 | AMERICAN TOWER CORP SR UNSECD NT DTD 08/16/10 5.050% DUE 09/01/20 Moody's: BAA3  S&P: BBB- | 029912BC5 | 77,763.75 103.685 | 631.24 | 80,141.53 106.855 | -2,377.78 | 3,787.50 | 4.87 3.41 |
| | **Total Investment Grade Taxable** | | $2,997,453.66 | $23,250.24 | $3,021,190.42 | -$23,736.76 | $75,997.50 | 2.53% |
| **International Developed Bonds** | | | | | | | | |
| | **2019** | | | | | | | |
| 125,000.000 | BANK NOVA SCOTIA BC UNSECD SR NT CANADA DTD 01/15/16 1.950% DUE 01/15/19 Moody's: A1  S&P: A+ | 064159HC3 | $124,466.25 99.573 | $717.70 | $125,190.45 100.152 | -$724.20 | $2,437.50 | 1.95 2.56 |

Page 13 of 22



Trade Date

# U.S. TRUST
Bank of America Private Wealth Management

## Portfolio Detail
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████ 4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ████ 4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| **Fixed Income (cont)** | | | | | | | | |
| **International Developed Bonds (cont)** | | | | | | | | |
| 150,000.000 | UBS AG STAMFORD BRH UNSECD MED TERM SR DEP NT SWITZERLAND DTD 08/14/14 2.375% DUE 08/14/19 Moody's: A1  S&P: A+ | 90261XHE5 | 149,172.00 99.448 | 761.97 | 151,269.42 100.846 | -2,097.42 | 3,562.50 | 2.38 2.89 |
| 75,000.000 | SHIRE ACQUISITIONS INVTS IRELAND UNSECD SR GBL NT IRELAND DTD 09/23/16 1.900% DUE 09/23/19 Moody's: BAA3  S&P: BBB- | 82481LAA7 | 73,675.50 98.234 | 150.41 | 74,083.50 98.778 | -408.00 | 1,425.00 | 1.93 3.22 |
| | **2020** | | | | | | | |
| 150,000.000 | BP CAP MKTS P L C SR UNSECD NT UNITED KINGDOM DTD 02/13/15 2.315% DUE 02/13/20 Moody's: A1  S&P: A- | 05565QCX4 | 148,597.50 99.065 | 752.37 | 151,102.57 100.735 | -2,505.07 | 3,472.50 | 2.33 2.87 |
| 125,000.000 | GE CAP INTL FDG CO SR UNSECD MTN IRELAND DTD 05/15/16 2.342% DUE 11/15/20 Moody's: A2  S&P: A | 36164QMS4 | 122,158.75 97.727 | 1,349.90 | 125,818.39 100.655 | -3,659.64 | 2,927.50 | 2.39 3.28 |
| | **Total International Developed Bonds** | | $618,070.00 | $3,732.35 | $627,464.33 | -$9,394.33 | $13,825.00 | 2.23% |
| **Total Fixed Income** | | | $3,615,523.66 | $26,982.59 | $3,648,654.75 | -$33,131.09 | $89,822.50 | 2.48% |

05/01 02 506

Trade Date

**U.S. TRUST**

Bank of America Private Wealth Management

**Portfolio Detail**

Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ████████4018   IM M & S RASHID – LBS – PLDG

| Units | Description | CUSIP Sector(2) | Market Value (1)/ Market Price | Accrued Income | Tax Cost/ Average Unit Cost | Unrealized Gain/Loss | Estimated Annual Income | Cur Yld/ YTM |
|---|---|---|---|---|---|---|---|---|
| Liabilities | | | | | | | | |
| -1.000 | ACCOUNT ASSETS ARE PLEDGED AS COLLATERAL ON LOAN | 99Z152201 | -$1.00 | $0.00 | -$1.00 1.000 | $0.00 | $0.00 | 0.00% |
| **Total Liabilities** | | | **-$1.00** | **$0.00** | **-$1.00** | **$0.00** | **$0.00** | **0.00%** |
| **Total Portfolio** | | | **$6,713,107.31** | **$30,725.72** | **$6,746,238.40** | **-$33,131.09** | **$140,313.13** | **2.09%** |
| Accrued Income | | | $30,725.72 | | | | | |
| **Total** | | | **$6,743,833.03** | | | | | |

20180501SPNH0000927300001 Sheet 9 of 12    05/01 02 506

Trade Date

## U.S. TRUST

Bank of America Private Wealth Management

**Activity Detail**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▮▮▮▮4026  MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account:* ▮▮▮▮4018  IM M & S RASHID – LBS – PLDG

| Date | Description | Cash | Tax Cost | Short-term Realized Gain/Loss | Long-term Realized Gain/Loss |
|---|---|---|---|---|---|
| **Income** | | | | | |
| **Dividends - Taxable** | | | | | |
| 04/02/18 | FIDELITY GOVERNMENT PORTFOLIO INSTITUTIONAL CLASS INCOME FOR MONTH ENDED 03/31/18 | $3,046.58 | | | |
| | **Total Dividends - Taxable** | **$3,046.58** | **$0.00** | **$0.00** | **$0.00** |
| **Interest - Taxable** | | | | | |
| 04/02/18 | BANK OF AMERICA TEMPORARY OVERNIGHT DEPOSIT INCOME FOR MONTH ENDED 03/31/18 | $8.75 | | | |
| 04/23/18 | ANHEUSER-BUSCH INBEV FIN INC SR UNSECD NT DTD 01/25/16 1.900% DUE 02/01/19 ACCRUED INTEREST FOR FULL CALL 04-23-18 | 649.17 | | | |
| 04/25/18 | FIFTH THIRD BK CINCINNATI OHIO UNSECD MEDIUM TERM SR BK NT CALL DTD 04/25/14 2.375% DUE 04/25/19 INTEREST ON 200,000.000 | 2,375.00 | | | |
| | **Total Interest - Taxable** | **$3,032.92** | **$0.00** | **$0.00** | **$0.00** |
| **Other Income** | | | | | |
| 04/10/18 | BANK MONTREAL UNSECD MEDIUM TERM SR NT CANADA DTD 04/10/15 1.400% DUE 04/10/18 INTEREST ON 150,000.000 | $1,050.00 | | | |

05/01 02 506

Trade Date



## U.S. TRUST
Bank of America Private Wealth Management

**Activity Detail**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████ 4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account* ████████ 4018   IM M & S RASHID – LBS – PLDG

| Date | Description | Cash | Tax Cost | Short-term Realized Gain/Loss | Long-term Realized Gain/Loss |
|---|---|---|---|---|---|
| Income (cont) | | | | | |
| **Other Income (cont)** | | | | | |
| 04/27/18 | TELEFONICA EMISIONES S A U<br>SR UNSECD NT SPAIN<br>DTD 04/29/13 3.192% DUE 04/27/18<br>INTEREST ON 75,000.000 | 1,197.00 | | | |
| | **Total Other Income** | **$2,247.00** | **$0.00** | **$0.00** | **$0.00** |
| **Total Income** | | **$8,326.50** | **$0.00** | **$0.00** | **$0.00** |
| Sales And Maturities | | | | | |
| 04/10/18 | BANK MONTREAL<br>UNSECD MEDIUM TERM SR NT CANADA<br>DTD 04/10/15 1.400% DUE 04/10/18<br>PROCEEDS MATURITY 150,000.000 | $150,000.00 | -$150,000.00 | | |
| 04/23/18 | ANHEUSER-BUSCH INBEV FIN INC<br>SR UNSECD NT<br>DTD 01/25/16 1.900% DUE 02/01/19<br>PROCEEDS FROM SALE DUE TO ENTIRE CALL<br>@ 100.0000% ON 150,000.000 PAR | 150,000.00 | -150,627.86 | | -627.86 |
| 04/27/18 | TELEFONICA EMISIONES S A U<br>SR UNSECD NT SPAIN<br>DTD 04/29/13 3.192% DUE 04/27/18<br>PROCEEDS MATURITY 75,000.000 | 75,000.00 | -75,000.01 | | -0.01 |
| **Total Sales And Maturities** | | **$375,000.00** | **-$375,627.87** | **$0.00** | **-$627.87** |

Page 17 of 22



Trade Date

## U.S. TRUST
Bank of America Private Wealth Management

### Activity Detail
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▮▮▮▮4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ▮▮▮▮4018   IM M & S RASHID – LBS – PLDG

| Date | Description | Cash | Tax Cost | Short-term Realized Gain/Loss | Long-term Realized Gain/Loss |
|------|-------------|------|----------|-------------------------------|------------------------------|
| Net Automated Money Market Transactions | | | | | |
| 04/30/18 | FIDELITY GOVERNMENT PORTFOLIO INSTITUTIONAL CLASS MONEY MARKET PURCHASE | -$383,326.50 | $383,326.50 | | |
| **Total Net Automated Money Market Transactions** | | **-$383,326.50** | **$383,326.50** | **$0.00** | **$0.00** |

05/01 02 506

Trade Date



U.S. TRUST

Bank of America Private Wealth Management

## Activity Detail

Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▆▆▆▆ 4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub-Account:* ▆▆▆▆ 4018   IM M & S RASHID – LBS – PLDG

| Date | Description | Market Value | Tax Cost | Short-term Realized Gain/Loss | Long-term Realized Gain/Loss |
|---|---|---|---|---|---|
| **Non-Cash Transactions** | | | | | |
| **Tax Cost Adjustments** | | | | | |
| 04/09/18 | BANK MONTREAL UNSECD MEDIUM TERM SR NT CANADA DTD 04/10/15 1.400% DUE 04/10/18 ACCRETION OF DISCOUNT | | $321.00 | | |
| 04/09/18 | BANK MONTREAL UNSECD MEDIUM TERM SR NT CANADA DTD 04/10/15 1.400% DUE 04/10/18 ACCRETION OF DISCOUNT | | 119.11 | | |
| 04/23/18 | ANHEUSER-BUSCH INBEV FIN INC SR UNSECD NT DTD 01/25/16 1.900% DUE 02/01/19 AMORTIZATION OF PREMIUM FOR DISPOSITION | | -180.19 | | |
| 04/25/18 | FIFTH THIRD BK CINCINNATI OHIO UNSECD MEDIUM TERM SR BK NT CALL DTD 04/25/14 2.375% DUE 04/25/19 AMORTIZATION OF PREMIUM | | -573.35 | | |
| 04/26/18 | TELEFONICA EMISIONES S A U SR UNSECD NT SPAIN DTD 04/29/13 3.192% DUE 04/27/18 AMORTIZATION OF PREMIUM | | -495.92 | | |
| 04/30/18 | GENERAL ELEC CAP CORP MTN DTD 04/21/08 5.625% DUE 05/01/18 AMORTIZATION OF PREMIUM | | -1,549.69 | | |



20180501SPNH0000927300001 Sheet 11 of 12     05/01 02 506

Trade Date

# U.S. TRUST

Bank of America Private Wealth Management

**Activity Detail**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ▇▇▇▇4026   MASHIYAT & SAIMA RASHID COMBINED
*Sub–Account:* ▇▇▇▇4018   IM M & S RASHID – LBS – PLDG

| Date | Description | Market Value | Tax Cost | Short-term Realized Gain/Loss | Long-term Realized Gain/Loss |
|---|---|---|---|---|---|
| Non-Cash Transactions (cont) | | | | | |
| **Tax Cost Adjustments (cont)** | | | | | |
| 04/30/18 | GENERAL ELEC CAP CORP MTN DTD 04/21/08 5.625% DUE 05/01/18 AMORTIZATION OF PREMIUM | | -828.77 | | |
| 04/30/18 | GENERAL ELEC CAP CORP MTN DTD 04/21/08 5.625% DUE 05/01/18 AMORTIZATION OF PREMIUM | | -506.80 | | |
| 04/30/18 | GENERAL ELEC CAP CORP MTN DTD 04/21/08 5.625% DUE 05/01/18 AMORTIZATION OF PREMIUM | | -529.57 | | |
| | **Total Tax Cost Adjustments** | $0.00 | -$4,224.18 | $0.00 | $0.00 |
| **Total Non-Cash Transactions** | | $0.00 | -$4,224.18 | $0.00 | $0.00 |

Page 20 of 22

05/01 02 506

Trade Date



U.S. TRUST

Bank of America Private Wealth Management

**Important Disclosures**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ██████████4026  MASHIYAT & SAIMA RASHID COMBINED

**Be sure to read these important disclosures. They may impact your understanding of this account statement and your rights with respect to the account.**

**Statement Content Disclosure**
*This statement was prepared to provide you with a detailed record of information for the period covered by this report. The gain/loss and income figures presented are preliminary and approximate and should not be used for tax preparation. Estimated annual income may differ from actual income received and should not be used for tax preparation. If you have any questions regarding this statement or your account, please call your client team.*

**Assets for which the Bank has Limited or No Responsibility**
*This statement may include assets that are not held and not managed by Bank of America. Assets that are not held and not managed by Bank of America are listed solely for the convenience of the client. Bank of America has no responsibility to manage, maintain, safekeep, monitor or value such assets.*

*This statement may also include other assets for which Bank of America has limited or no management responsibility and/or no valuation responsibility pursuant to the terms of the governing document, or client agreements or directions.*

**Real Property, Closely Held Businesses and Oil, Gas and Mineral Interest**
*Market Values for any Real Property and Closely Held Business investments are approximations based on periodic appraisals, assessments or common practices for these types of assets. Such values are updated at intervals set in accordance with our procedures and may differ from a value derived today by the same method. Market values for any Oil, Gas and Mineral interests are calculated from the most recent 12 months' net income from producing interests and include a nominal value for non producing properties. These market values should not be used or relied on for transactional, tax or any purposes other than general information.*

**Auction Rate Securities Notice**
*To holders of Auction Rate Securities: Due to continuing unprecedented conditions in the Auction Rate Securities market, the pricing of Auction Rate Securities as reflected on your statement may not be indicative of readily available pricing if you desired to and could liquidate these holdings. Additionally, some Auction Rate Securities may not be priced and will reflect a valuation of unavailable or zero. Thus, these securities will not be included in the account's market valuation total.*

**Common Trust Funds and Collective Investment Fund Disclosure**
*If you are a participant in a Bank of America Common Trust Fund or Collective Investment Fund, a full copy of the most recent audited annual report is available upon request without charge. Unaudited interim reports of Bank of America Common Trust Fund or Collective Investment Fund asset holdings are also available periodically without charge upon reasonable request. Please call your client team for a copy.*

**Compliance with Applicable Laws**
*You may not use your account or relationship to the firm to process transactions that are prohibited by law, including, but not limited to, restricted transactions prohibited by the Unlawful Internet Gambling Enforcement Act of 2006.*

**Disclosures continue on the following page**
Page 21 of 22

Trade Date

## U.S. TRUST
Bank of America Private Wealth Management

**Important Disclosures**
Apr. 01, 2018 through Apr. 30, 2018

*Account:* ████████4026   MASHIYAT & SAIMA RASHID COMBINED

**NYSE Specialist Disclosure**
*Bank of America, N.A. is associated with a NYSE Specialist, which may make a market in a security referenced herein. The Specialist may have a "long" or "short" inventory position and, as a result of being a market maker, may be on the opposite side of transactions on the Floor of the NYSE in such security.*

**Affiliate Disclosures**
*Affiliates of Bank of America may provide services relating to certain investments in your account. These services may, where appropriate, include underwriting or participating in the syndication of securities purchased for your account and executing brokerage transactions for your account. Bank of America will, where appropriate, invest your account in mutual funds for which affiliates provide investment advice and other services, or in Bank depository vehicles for which the Bank receives a financial benefit. Affiliates are compensated for these services and transactions in accordance with applicable law.*

*The overall investment activities of Bank of America and its affiliates may limit the investment opportunities for accounts under their management (collectively, the "Accounts") in certain markets in which limitations are imposed by regulators upon the amount of investment by affiliated investors, in the aggregate or in individual issuers. From time to time, the Account's activities also may be restricted because of regulatory restrictions applicable to Bank of America and its affiliates, and/or their internal policies.*

**Bank of America Temporary Overnight Deposit**
*If Bank of America Temporary Overnight Deposit is reflected in the Cash Equivalent section of your statement, cash posted to your account after the trading deadline for your selected cash equivalent asset on a business day during the statement period. These balances are automatically swept into a Bank of America deposit account overnight and then are automatically transferred into your selected cash equivalent asset the following business day. If a market value is associated with the Bank of America Temporary Overnight Deposit, this activity occurred on the last business day during the statement period, otherwise market value will be zero.*

**Trust Owned Life Insurance Policies**
*The value shown for Trust Owned life insurance policies is provided for informational purposes only. It is based on the most recent policy statements from the issuing companies and has not been updated or independently verified. The value shown is the gross value and does not reflect any potential liabilities, such as surrender charges, loans, or split-dollar liabilities. Copies of the policy statements, which may provide additional information on liabilities, will be mailed to you separately. This disclosure does not apply to Institutional Retirement accounts.*

05/01 02 506

Exhibit 3



U.S. TRUST
Bank of America Private Wealth Management

## Your checking account

Account number: 3302

# Your Univ of Michigan Adv Tiered Interest Chkg

**MR MASHIYAT RASHID    SAIMA RASHID**

## Account summary

| | |
|---|---|
| Beginning balance on June 17, 2017 | $26,608.35 |
| Deposits and other additions | 114,500.33 |
| ATM and debit card subtractions | -805.59 |
| Other subtractions | -132,732.79 |
| Checks | -7,444.97 |
| Service fees | -125.00 |
| **Ending balance on July 17, 2017** | **$0.33** |

*Annual Percentage Yield Earned this statement period: 0.02%.*
*Interest Paid Year To Date: $18.85.*
*Your account has overdraft protection provided by deposit account number*
*3750 0935 8653.*

## Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 07/07/17 | FUNDS TRANSFER CREDIT FDES NNC 3181760 158467 | 100,000.00 |
| 07/10/17 | BOFA MERCH SVCS DES:DEPOSIT     ID:372536069886 INDN:NATIONAL LABORATORIE    CO ID:XXXXXXXXXB CCD | 2,000.00 |
| 07/12/17 | BOFA MERCH SVCS DES:DEPOSIT     ID:372536069886 INDN:NATIONAL LABORATORIE    CO ID:XXXXXXXXXB CCD | 12,500.00 |
| 07/17/17 | Interest Earned | 0.33 |
| | **Total deposits and other additions** | **$114,500.33** |

## Withdrawals and other subtractions

ATM and debit card subtractions

| Date | Description | Amount |
|---|---|---|
| 06/19/17 | PMNT SENT 0616 SQC*ARRION . /          CA 24492157167740234727900 | -50.00 |
| 06/19/17 | PMNT SENT 0616 SQC*ARRION . /          CA 24492157167740236470806 | -50.00 |
| 06/19/17 | CHECKCARD 0617 COSTCO WHSE #0341 COMMERCE TOWNMI 24431067169898000050569 | -47.82 |
| 07/03/17 | CHECKCARD 0701 VENMO 855-812-4430 NY 24493987182602016958352 | -50.00 |

*continued on the next page*

MASHIYAT M RASHID | Account # ■■■■ 8653 | June 17, 2017 to July 17, 2017

## Withdrawals and other subtractions - continued

### ATM and debit card subtractions - continued

| Date | Description | Amount |
|---|---|---|
| 07/06/17 | CHECKCARD 0704 PEPPERIDGE FARM - 353 BIRCH RUN   MI 24269797186100249061400 | -7.77 |
| 07/07/17 | BKOFAMERICA ATM 07/06 #000002853 WITHDRWL 8 MILE/DEQUINDRE  DETROIT       MI | -600.00 |
| **Total ATM and debit card subtractions** | | **-$805.59** |

### Other subtractions

| Date | Description | Amount |
|---|---|---|
| 06/19/17 | GMF LEASING        DES:LEASE PAYM ID:00171929474 INDN:RASHID, JAHA A        CO ID:2205477679 PPD | -290.64 |
| 06/19/17 | KEEP THE CHANGE TRANSFER TO ACCT 8653 FOR 06/19/17 | -0.18 |
| 06/20/17 | COMMERCIAL LOANS DEBIT | -5,768.50 |
| 07/03/17 | COMMERCIAL LOANS DEBIT | -1,021.31 |
| 07/03/17 | BOFA MERCH SVCS  DES:DEPOSIT      ID:372536069886 INDN:NATIONAL LABORATORIE   CO ID:XXXXXXXXXB CCD | -44.95 |
| 07/05/17 | ALLSTATE INS CO  DES:INS PREM    ID:000000960615710 INDN:RASHID           CO ID:1360719665 PPD | -1,275.73 |
| 07/06/17 | KEEP THE CHANGE TRANSFER TO ACCT 8653 FOR 07/06/17 | -0.23 |
| 07/10/17 | Online Banking transfer to SAV 8653 Confirmation# 3565841770 | -59,623.03 |
| 07/12/17 | Legal Order, LTS D071217000672 | -64,679.71 |
| 07/13/17 | CHECKCARD 0710 THAI PEPPERS | -28.51 |
| **Total other subtractions** | | **-$132,732.79** |

## Checks

| Date | Check # | Amount |
|---|---|---|
| 06/19/17 | 1080 | -3,000.00 |
| 06/21/17 | 1086* | -200.00 |
| 06/20/17 | 1087 | -360.00 |
| 06/27/17 | 1089* | -125.00 |
| 06/28/17 | 1091* | -2,100.00 |
| 06/29/17 | 1092 | -500.00 |

| Date | Check # | Amount |
|---|---|---|
| 07/06/17 | 1094* | -500.00 |
| 07/05/17 | 1095 | -280.00 |
| 07/05/17 | 1096 | -50.00 |
| 07/07/17 | 1097 | -184.97 |
| 07/10/17 | 1101* | -145.00 |

| | |
|---|---|
| **Total checks** | **-$7,444.97** |
| **Total # of checks** | **11** |

* There is a gap in sequential check numbers

U.S. TRUST 

**Your checking account**

Bank of America Private Wealth Management
MASHIYAT M RASHID | Account # ▮▮▮▮8653 | June 17, 2017 to July 17, 2017

## Service fees

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 07/12/17 | Legal Order Fee,LTS D071217000672 | -125.00 |
| **Total service fees** | | **-$125.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

This page intentionally left blank

Exhibit 4


U.S. TRUST
Bank of America Private Wealth Management

**Your savings account**

Account number: ███████ 8653

# Your US Trust MMS Money Market Savings

**MASHIYAT M RASHID    SAIMA RASHID**

## Account summary

| | |
|---|---|
| Beginning balance on June 17, 2017 | $4,000,376.56 |
| Deposits and other additions | 150,036.65 |
| ATM and debit card subtractions | -0.00 |
| Other subtractions | -4,150,000.00 |
| Service fees | -0.00 |
| **Ending balance on July 17, 2017** | **$413.21** |

*Annual Percentage Yield Earned this statement period: 0.15%.*
*Interest Paid Year To Date: $2,465.12.*

## Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 06/20/17 | KEEPTHECHANGE CREDIT FROM ACCT3302 EFFECTIVE 06/19 | 0.18 |
| 07/07/17 | KEEPTHECHANGE CREDIT FROM ACCT3302 EFFECTIVE 07/06 | 0.23 |
| 07/07/17 | Counter Credit | 90,000.00 |
| 07/10/17 | Online Banking transfer from CHK 3302 Confirmation# 3565841770 | 59,623.03 |
| 07/17/17 | Interest Earned | 413.21 |
| **Total deposits and other additions** | | **$150,036.65** |

MASHIYAT M RASHID   |   Account #■■■■■■■8653   |   June 17, 2017 to July 17, 2017

## Withdrawals and other subtractions

Other subtractions

| Date | Description | Amount |
|------|-------------|--------|
| 07/10/17 | MI TLR cash withdrawal from SAV 8653 | -500,000.00 |
| 07/12/17 | Legal Order, LTS D071217000672 | -3,650,000.00 |
| **Total other subtractions** | | **-$4,150,000.00** |

Exhibit 5



July 26, 2017

**NOTICE OF DEFAULT AND DEMAND FOR PAYMENT IN FULL**

**Via Certified Mail and First Class Mail**

Mashiyat Rashid
Saima Rashid
5591 Walnut Ridge Ct.
West Bloomfield, Mi 48322-2090

**RE:** **Notice of Default and Demand for Payment In Full** under Credit Agreement and Pledge Security Documents (collectively, the "Loan Documents") between Bank of America, N.A., ("Bank") and Mashiyat Rashid and Saima Rashid (Borrowers) in the original committed amount of $5,000,000.00 dated July 20, 2016".

Dear Mr. Rashid:

This office has been retained to represent Bank of America, N. A. with respect to Borrower's loan relationships with the Bank. The above referenced loan is a demand note and the Bank hereby makes demand for payment in full.

Repayment of the Loan is secured by a marketable securities brokerage account at Merrill Lynch.

Bank of America demands the immediate repayment of the entire Indebtedness and intends to enforce the Loan Documents, if necessary. As of July 24, 2017 the amount owing is as follows:

| | |
|---|---|
| Principal: | $2,020,017.00 |
| Interest: | $837.91 |
| Late Fees: | 0 |
| **Amount Due:** | **$2,020,854.91** |

plus all interest accruing after that date, any prepayment premiums or other fees as provided for in the Loan Documents, and all expenses and attorneys' fees incurred by the Bank (the "Indebtedness").

Demand is made that you pay Bank of America the amount outstanding **on or before August 4, 2017, at 4:00 p.m. local time**. Payment should be made to the following address:

A T T O R N E Y S  &  C O U N S E L O R S  A T  L A W

38505 Woodward Ave., Suite 100 • Bloomfield Hills, MI 48304 • T: (248) 901-4000 • F: (248) 901-4040 • plunkettcooney.com

Page 2
July 26, 2017

Bank of America
c/o Daniel Langelier
Senior Vice President
Mail Code: FL1-400-16-07
101 E. Kennedy Blvd., 16th Floor
Tampa, Florida 33602

Please note that the balance due as set forth in this letter is subject to final review and audit by Bank of America. You should contact Mr. Langelier at (813) 225-8378 for verification of the total amount due on the Loan Documents before making final payment. Failure to pay the Indebtedness on or before August 4, 2017, may lead the Bank to filing a suit against the Borrowers and setoff against the pledged securities account. Please also be advised that the Bank may invoke the default rate of interest on the Loan as of July 25, 2017.

The Bank expressly reserves the right to exercise any and all rights and remedies provided under the Loan Documents and applicable law at any time. The Bank's failure to immediately exercise such rights and remedies is not a waiver or modification of those rights, an offer of forbearance of any kind, and should not be construed by you as any forbearance on the part of the Bank. Please govern yourselves accordingly.

Very truly yours,

PLUNKETT COONEY

Rasul M. Raheem
Direct Dial: 248.294.2704

cc:     Daniel Langelier, Bank of America
        Sara Mobley, Esquire

18819270

Open.23766.72254.18819682-1

# Bank of America 

## CREDIT AGREEMENT

This Credit Agreement, dated as of July 20, 2016, by and among the borrower(s) signing below (whether one or more, the "Borrower" or the "Credit Parties") and Bank of America, N.A., a national banking association (together with its successor and assigns, the "Bank").

## P R E L I M I N A R Y   S T A T E M E N T S

1. The Borrower wishes to obtain a credit facility, the proceeds of which are intended to be used for lawful purposes that will benefit the Borrower.

2. Upon the terms and subject to the conditions set forth herein, the Bank is willing to consider requests by the Borrower for loans to the Borrower in an aggregate principal amount not to exceed the "Maximum Amount of the Facility" (as defined below).

3. The Credit Parties acknowledge that loans under this credit facility are made at the sole and absolute discretion of the Bank and that the Bank may demand repayment of such loans at any time in its sole and absolute discretion.

4. The following is a non-exhaustive summary of some basic terms of this Credit Agreement. This summary is not intended to set forth all material terms of the credit facility. The Credit Parties acknowledge that this summary is qualified by a reference to all terms set forth in this Credit Agreement:

**BORROWER:**   Mashiyat Rashid
Salma Rashid
5591 Walnut Ridge Ct
West Bloomfield, MI 48322-2090
Phone: 248-943-1216
Fax: _____
(this is where notices will be sent)

**PLEDGOR(S):**   Borrower

**MAXIMUM AMOUNT
OF FACILITY:**   $5,000,000.00, as such amount may be decreased or increased from time to time by Bank in its sole discretion.

**TYPE OF FACILITY:**   DISCRETIONARY—LOANS EXTENDED IN THE SOLE AND ABSOLUTE DISCRETION OF THE BANK.

**PRINCIPAL DUE DATE:**   LOANS REPAYABLE IMMEDIATELY UPON DEMAND BY THE BANK.

**INTEREST PAYMENT
DATE:**   August 20, 2016, and each corresponding day (or if there is no corresponding day in any month when payment is due, then on the last day of such month) of each succeeding month thereafter, if not sooner demanded by Bank.

1

**INTEREST RATE:**      LIBOR Daily Floating Rate plus the Applicable Margin

If requested by Borrower and agreed by the Bank, Loans in a minimum amount of $100,000 may bear interest at the LIBOR Rate for Interest Periods of one, two, three, six or twelve months, in each case, plus the Applicable Margin. The Borrower's election of an interest rate and an Interest Period other than the Daily Floating Rate may result in breakage fees if Loans are demanded or repaid prior to the end of the applicable Interest Period.

The interest rate shall be increased to the Default Rate as specified herein.

All interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used.

**APPLICABLE MARGIN:**      2.5%.

**MINIMUM INITIAL
ADVANCE:**      If the Borrower is an individual or trust, the minimum initial advance shall be the greater of (i) $55,000 and (ii) the amount the Bank determines, in its sole discretion, is necessary to comply with applicable Law. In all other cases, the minimum initial advance shall be $25,000.

**PLEDGED COLLATERAL:**      The Pledged Accounts, including the cash, securities and other assets held in such accounts and other collateral all as further described in this Credit Agreement and on Schedule A. No Pledged Collateral will be released from the Pledged Accounts, except as permitted by the Bank.

**LIQUIDATION OF
PLEDGED COLLATERAL:**      Immediately upon demand.

**DISBURSEMENT AND
IF INDICATED, DEBIT
ACCOUNT
WITH BANK:**      Account name: Mr. Mashiyat Rashid, Saima Rashid
Account       83302

      ☒ Automatic debit (if this box is checked, the Bank is authorized to debit the above account in accordance with the provisions of this Agreement)

**USE OF PROCEEDS:**      Loan proceeds may not be used directly or indirectly to purchase or carry any Margin Stock or to reduce or retire any indebtedness incurred for such purpose.

      **NOW, THEREFORE,** the Credit Parties and the Bank, intending to be legally bound, hereby agree as follows:

2

## ARTICLE 1

### DEFINITIONS

**SECTION 1.1. Defined Terms.** As used in this Agreement, in addition to the terms defined in the introductory paragraph of this Agreement, the following terms shall have the following meanings:

"Accrued Amount" has the meaning specified in Section 2.7(k).

"Act" has the meaning specified in Section 5.11(d).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a relative, director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 51% or more of the securities (which term includes capital stock, partnership interests, membership interests or other equity interests) having ordinary voting power of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or similar equity interests, by contract or otherwise.

"Agreement" means this credit agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Margin" means, with respect to Loans, that percentage per annum set forth in the Preliminary Statements.

"Banking Day" means, unless otherwise provided in this Agreement, a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in Dollar deposits are conducted among banks in the offshore Dollar interbank market.

"Billed Amount" has the meaning specified in Section 2.7(j).

"Code" means the Uniform Commercial Code as in effect from time to time in the State of North Carolina.

"Control Agreement" means collectively one or more control agreements with third parties, in each case, in form and substance satisfactory to the Bank.

"Daily Floating Rate" has the meaning specified in Section 2.1(c).

"Default Rate" means a rate of interest which is 6.0 percentage points per annum higher than the interest rate otherwise provided in this Agreement, unless the Bank is unable to determine the applicable LIBOR Rate or LIBOR Daily Floating Rate, in which case the "Default Rate" means the Prime Rate plus 6% per annum.

"Designated Account" has the meaning specified in Section 2.7(i).

"Dollars," "US" or "$" means lawful money of the United States of America.

"Due Date" has the meaning set forth in Section 2.7(l).

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America or any Governmental Authority succeeding to its functions.

"Governmental Authority" means any nation or government, any state or other political subdivision or agency thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government including, without limitation, the Federal Reserve Board.

"Highest Lawful Rate" means, at any time during which any Obligations shall be outstanding hereunder, the maximum nonusurious interest rate that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under applicable Law, in any case after taking into account, to the extent permitted by applicable Law, any and all relevant payments or charges under this Agreement and the other Loan Documents, and any available exemptions, exceptions and exclusions.

"Indemnified Party" has the meaning specified in Section 6.4(b).

"Insolvency Event" means, with respect to any Credit Party, the occurrence of any of the following: (i) such Credit Party shall be adjudicated insolvent or bankrupt, or shall generally fail to pay or admit in writing its inability to pay its debts as they become due; (ii) such Credit Party shall seek dissolution, arrangement, winding-up or reorganization or the appointment of a receiver, trustee, custodian or liquidator for it or a substantial portion of its property, assets or business or to effect a plan or other arrangement with its creditors; (iii) such Credit Party shall make a general assignment for the benefit of its creditors, or consent to or acquiesce in the appointment of a receiver, trustee, custodian or liquidator for a substantial portion of its property, assets or business; (iv) such Credit Party shall file a voluntary petition under any bankruptcy, insolvency or similar Law; (v) such Credit Party, or a substantial portion of its property, assets or business shall become the subject of an involuntary proceeding or petition seeking (A) to adjudicate it bankrupt or insolvent, or (B) any dissolution, reorganization, winding-up, arrangement, protection, relief or composition of it or its indebtedness or the appointment of a receiver, trustee, custodian or liquidator, or shall become subject to any writ, judgment, warrant of attachment, execution or similar process and such proceeding, petition, writ, judgment, warrant of attachment, execution or similar process shall not have been released, vacated, withdrawn, dismissed or bonded, as the case may be, within forty-five (45) days of the commencement thereof; or (vi) such Credit Party shall take any action to authorize any of the foregoing.

"Interest Coverage Loans" has the meaning specified in Section 2.1(b).

"Interest Payment Date" has the meaning specified in the Preliminary Statements.

"Interest Period" means, the period of time requested by the Borrower and agreed to by the Bank as the applicable interest period in connection with the making or the continuation of a Loan bearing interest at the Optional Rate, which shall be a period of one, two, three, six or twelve months.

"Law" or "Laws" means any law (including common law), constitution, statute, treaty, convention, regulation, rule, ordinance, code, order, injunction, writ, decree, judgment or order of any Governmental Authority or other determination by an arbitrator, court or Governmental Authority.

"LIBOR Daily Floating Rate" means a fluctuating rate of interest which can change on each Banking Day. The rate will be adjusted on each Banking Day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Bank) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. The Bank will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days (as defined below) prior to the date in question, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by the Bank. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"LIBOR Rate" means the interest rate determined by the following formula. (All amounts in the calculation will be determined by the Bank as of the first day of the applicable Interest Period.)

$$\text{LIBOR Rate} = \frac{\text{LIBOR}}{(1.00 - \text{Reserve Percentage})}$$

Where,

4

(a) "LIBOR" means, for any applicable Interest Period, the rate per annum equal to the London Interbank Offered Rate (or any successor rate which is approved by the Bank), as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Bank from time to time) at approximately 11:00 a.m. London time two (2) London Banking Days before the commencement of the Interest Period, for U.S. Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the rate for that Interest Period will be determined by such alternate method as reasonably selected by the Bank. If at any time LIBOR is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

(b) "Reserve Percentage" means the total of the maximum reserve percentages for determining the reserves to be maintained by member banks of the Federal Reserve System for Eurocurrency Liabilities, as defined in Federal Reserve Board Regulation D, rounded upward to the nearest 1/100 of one percent. The percentage will be expressed as a decimal, and will include, but not be limited to, marginal, emergency, supplemental, special, and other reserve percentages.

"LIBOR Rate Loan" has the meaning specified in Section 2.1(d).

"Loan" and "Loans" has the meaning specified in Section 2.1(a).

"Loan Documents" means this Agreement, the Disclosure, Waiver of Conflict of Interest, Acknowledgment and Release executed in connection with this Agreement, and each other document, agreement and instrument from time to time executed by one or more of the Credit Parties or any other Person and delivered to the Bank in connection herewith.

"London Banking Day" means a day on which banks in London are open for business and dealing in offshore Dollars.

"Margin Stock" has the meaning ascribed and assigned to such term in Regulation U.

"Material Adverse Effect" means a material adverse effect on (i) the rights and remedies of the Bank under any Loan Document or (ii) the ability of any Credit Party to perform its obligations under any Loan Document.

"Maximum Amount of the Facility" means that amount set forth in the Preliminary Statements. The Bank may elect to provide written notice of a decrease or increase in the Maximum Amount of the Facility to the Credit Parties from time to time but no such notice is required and no change in the Maximum Amount of the Facility shall be deemed to create an obligation of the Bank to make any loan hereunder.

"Minimum Initial Advance" means the greater of (i) $55,000 and (ii) the amount the Bank determines, in its sole discretion, is necessary to comply with applicable Law.

"Notice of Borrowing" has the meaning specified in Section 2.2.

"Notice of Conversion or Continuation" has the meaning set forth in Section 2.3(b).

"Notice of Demand" has the meaning specified in Section 2.7(a).

"Obligations" means the obligations of the Credit Parties hereunder and under the other Loan Documents to the Bank of any kind, including, without limitation, any liability on any claim, whether or not the right of the Bank to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any Insolvency Event. Without limiting the generality of the foregoing, the Obligations of the Credit Parties include (i) the obligation to pay principal, interest, charges, expenses, fees, including, without limitation, attorneys' and other professionals' fees (including any allocated costs of the Bank's in-house counsel to

the extent permitted by applicable Law) and disbursements, indemnities and other amounts payable by the Credit Parties under any Loan Document, and (ii) the obligation to reimburse any amount in respect of any of the foregoing that the Bank, in its sole discretion, may elect to pay or advance on behalf of any of the Credit Parties.

"Optional Interest Rate" has the meaning specified in Section 2.1(d).

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, trust (including a business trust), unincorporated association, joint venture or other business entity, or a Governmental Authority.

"Pledged Accounts" means, collectively, the accounts, if any, of the Pledgors described on Schedule A (as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon or by other amendment) as being "pledged accounts."

"Pledged Collateral" means, collectively, the Pledged Accounts, all of the Pledgors' Property rights pertaining thereto, all Property which has been or may hereafter be delivered to, transferred to or deposited in or credited to such Pledged Accounts, and all of the other Property described on Schedule A (as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon) in which the Bank is being granted a security interest in order to secure the payment and performance of the Obligations.

"Pledgor" means a Credit Party that grants a security interest in its Pledged Collateral pursuant to this Agreement.

"Prime Rate" means for any day a fluctuating rate per annum equal to the rate of interest in effect for such day as publicly announced from time to time by the Bank as its "prime rate." The "prime rate" is a rate set by the Bank based upon various factors including the Bank's cost and desired return, general economic conditions and other factors, and is used as reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the "prime rate" announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"Property" means goods and merchandise, funds, cash balances, "investment property" (including securities whether certificated, uncertificated and book-entry securities, security entitlements, securities accounts, commodity contracts or commodity accounts) and other financial assets, "deposit accounts," "general intangibles" and "instruments" (as such terms are defined in the Code, and which terms shall be deemed to include all Pledged Accounts and all assets from time to time contained in any Pledged Accounts), accounts receivable, choses in action and any and all other forms of property whether real, personal or mixed, together with the proceeds thereof, any right, title or interest therein or thereto, and any documents relative thereto.

"Regulation U" means Regulation U of the Federal Reserve Board, or any successor, statute or regulation thereto as in effect from time to time.

"Sanctions" has the meaning specified in Section 3.1(j).

SECTION 1.2.  **Other Definitional Provisions.**  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in each other Loan Document.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, Schedule, Exhibit and Preliminary Statement references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms and where the context requires, pronouns and modifiers in the masculine, feminine or neuter genders shall be deemed to refer to or include the other genders.

6

**SECTION 1.3.  Computation of Time Periods.**  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

## ARTICLE 2

## AMOUNTS AND TERMS OF LOANS

### SECTION 2.1.  Loan Requests.

(a)  Subject to the terms and conditions hereof, the Borrower may request the Bank to make demand loans (each, a "Loan" and collectively, the "Loans") to the Borrower on any Banking Day in an aggregate principal amount which, after giving effect thereto, would not cause the aggregate principal amount of all outstanding Loans to exceed the Maximum Amount of the Facility.  If there is more than one Borrower, any Borrower (or a person or persons authorized by any one of the Borrowers), acting alone, may request the Bank to make a Loan under this Agreement.  Each Borrower will be liable for all extensions of credit made under this Agreement to any other Borrower.  **The Bank may make Loans in its sole and absolute discretion, and may decline to make Loans, with or without cause.**

(b)  If any Borrower is a natural person or a revocable trust and the Bank agrees to make a Loan hereunder, the initial Loan shall be in an amount equal to or greater than the Minimum Initial Advance.  In all other cases, the initial Loan shall be in a minimum amount of $25,000.  All subsequent Loans made hereunder shall be in a minimum amount of $25,000.  Notwithstanding the immediately preceding sentence, Loans, the proceeds of which are used by the Borrower to pay interest on other Loans (collectively, "Interest Coverage Loans"), may be in amounts of less than $25,000.

(c)  Except as set forth below, each Loan shall bear interest at the LIBOR Daily Floating Rate plus the Applicable Margin (the "Daily Floating Rate").

(d)  The Borrower may request, in lieu of the Daily Floating Rate, that any Loan bear interest at the LIBOR Rate for an applicable Interest Period plus the Applicable Margin (the "Optional Interest Rate;" and each such Loan bearing interest at the Optional Interest Rate shall be referred to as a "LIBOR Rate Loan") by requesting such a Loan no later than 12:00 noon Eastern time on the Banking Day preceding the day on which LIBOR will be set, as specified in the definition of LIBOR Rate.  For example, if there are no interfering holidays or weekend days in any of the relevant locations, the request must be made at least three (3) days before the applicable LIBOR Rate takes effect.  Each LIBOR Rate Loan shall be in an amount not less than $100,000.  For the avoidance of doubt, no Interest Coverage Loan shall bear interest at an Optional Interest Rate unless such Loan is extended as, or as part of, a LIBOR Rate Loan in an amount not less than $100,000.

(e)  **The Borrower expressly acknowledges that the Bank may decline to make any Loan (whether bearing interest at the Daily Floating Rate or at the Optional Interest Rate) in its sole and absolute discretion and at any time, whether or not the amount of the Loans outstanding at such time exceeds the Maximum Amount of the Facility.**

### SECTION 2.2.  Notices of Borrowing.

(a)  Each Loan shall be requested by the Borrower pursuant to a notice (each notice, a "Notice of Borrowing") given to the Bank.  The proposed date of any such Loan shall be a Banking Day.  Each Notice of Borrowing shall specify therein (i) the proposed date of such Loan, (ii) the proposed aggregate principal amount of such Loan, (iii) whether the Loan is requested to be a LIBOR Rate Loan, and (iv) in the case of a requested LIBOR Rate Loan, the requested Interest Period for such Loan.  Any Notice of Borrowing shall be irrevocable.

(b)  Upon receipt of a Notice of Borrowing, the Bank may (a) notify the Borrower by telephone, or by any other means provided for in this Agreement, whether the Bank will make available the amount of the Loan requested (and in the case of a LIBOR Rate Loan, for the Interest Period requested thereunder), on the date

7

specified therefor or (b) advance the Loan requested without any other notification to Borrower, which advance shall be deemed to be the Bank's agreement to advance the Loan on the terms requested by Borrower. Notwithstanding the foregoing or anything else to the contrary contained herein, any failure of the Bank to provide such notice or to so fund such requested Loan shall be deemed to be a denial by the Bank of the Loan requested in such Notice of Borrowing.

(c)     Loan advances will be deposited in the Disbursement and Debit Account set forth in the Preliminary Statements or shall be disbursed as otherwise agreed between the Borrower and the Bank.

(d)     Any Notice of Borrowing shall be irrevocable and the Borrower shall be bound to continue in accordance therewith, subject only to the Bank's consent to the requested Loan in Bank's sole and absolute discretion.

## SECTION 2.3. Notice of Conversion or Continuation of LIBOR Rate Loans.

(a)     At the end of each Interest Period of a LIBOR Rate Loan, the interest rate for such Loan will revert to the Daily Floating Rate, unless the Borrower has designated, and the Bank has agreed to, another Optional Interest Rate for such Loan; provided, however, that if an Insolvency Event has occurred, any Obligation is not paid by the day on which same becomes due and payable, or such Loan becomes the subject of a Notice of Demand, such Loan may only be continued as a Loan bearing interest at the Daily Floating Rate.

(b)     In the event the Borrower shall wish to convert any outstanding Loan to a LIBOR Rate Loan or to elect to continue any Loan as a LIBOR Rate Loan, the Borrower shall deliver a notice of conversion or continuation to the Bank (a "Notice of Conversion or Continuation"), no later than 12:00 noon Eastern time on the Banking Day preceding the day on which LIBOR will be set, as specified in the definition of LIBOR Rate. For example, if there are no intervening holidays or weekend days in any of the relevant locations, the request must be made at least three (3) days before the proposed continuation date. A Notice of Conversion or Continuation shall specify (i) the proposed conversion date on which a Loan bearing interest at the Daily Floating Rate shall be converted to a LIBOR Rate Loan or the continuation date for an existing LIBOR Rate Loan (which shall be a Banking Day), (ii) the amount of the Loan to be converted to or continued as a LIBOR Rate Loan, which must be in a minimum amount of $100,000 and (iii) the requested Interest Period for such Loan.

(c)     Upon receipt of the Notice of Conversion or Continuation, the Bank may notify the Borrower by telephone or by any other means provided for in this Agreement, whether the Bank will agree to the requested conversion or continuation of the LIBOR Rate Loan and Interest Period or may convert to or continue such LIBOR Rate Loan in accordance with such request without notice. The failure of the Bank to convert to or to continue the LIBOR Rate Loan as requested in the Notice of Conversion or Continuation shall be deemed to be a denial by Bank of the requested Notice of Conversion or Continuation. If the Bank does not agree to the Interest Period requested, such Loan shall automatically be continued as a Loan bearing interest at the Daily Floating Rate.

(d)     Any Notice of Conversion or Continuation shall be irrevocable and the Borrower shall be bound to continue in accordance therewith, subject only to the Bank's consent to the Interest Period requested by the Borrower.

SECTION 2.4. Evidence of Debt to the Bank. The Bank shall maintain in its records one or more accounts evidencing the Obligations, the amounts of Loans made by the Bank and of principal and interest payable and paid to the Bank from time to time under this Agreement. In any legal action or proceeding in respect of this Agreement, the Bank's records shall be conclusive evidence of the existence and amounts of the Obligations, absent manifest error. The Bank will not be obligated to provide written confirmations of specific Loan disbursements or payments.

SECTION 2.5. Use of Proceeds. The proceeds of the Loans shall be used by the Borrower for lawful purposes for the benefit of the Borrower and, if the Borrower is not a natural person, in accordance with the Borrower's organizational documents. The proceeds of the Loans MAY NOT BE used directly or indirectly to purchase or carry Margin Stock or reduce or retire Indebtedness incurred for such purpose. In no event shall the

8

proceeds of the Loans be used to purchase stock of Bank of America Corporation or its affiliated mutual funds or other securities issued or underwritten by the Bank's affiliates unless the Bank shall otherwise consent in writing. Each Notice of Borrowing shall be deemed to be a certification and representation by Borrower that the proceeds of the requested Loans will be utilized in accordance with this Section.

**SECTION 2.6.   Default Rate.**   Notwithstanding the rate of interest and the payment dates otherwise specified in this Agreement, if any principal, interest, fee or other amount payable hereunder or under any other Loan Document is not paid by the day on which the same becomes due and payable, or there is an Insolvency Event, then, in the discretion of the Bank, interest shall accrue on all of the Obligations at the Default Rate; which shall be payable to the Bank immediately, without notice or demand of any kind.  This may result in compounding of interest.  This will not constitute a waiver of any breach of any of the provisions of this Agreement.

**SECTION 2.7.   Payments.**

(a)      **The Bank shall have the right to demand payment from the Borrower at any time of all or any part of each Loan made by it hereunder (regardless of whether such Loan was extended by the Bank at the Daily Floating Rate or the Optional Interest Rate) by delivering to the Borrower a demand for payment, which may be made by telephone, or in any other manner provided for in this Agreement (any such demand, whether in writing or by telephone, a "Notice of Demand").**

(b)      Without limiting the right of the Bank to demand payment at any time of all or any part of each Loan held by it hereunder and interest accrued thereon: (i) interest accrued on each Loan shall be payable by the Borrower in arrears on each Interest Payment Date; and (ii) interest accrued on each Loan shall be payable on the date that all or any portion of the principal amount of such Loan is repaid to Bank, whether pursuant to a Notice of Demand or otherwise.

(c)      The Borrower shall repay to the Bank the principal amount of each Loan and all other Obligations related thereto demanded under a Notice of Demand.  Repayments of each Loan and the other Obligations related thereto shall be due immediately following delivery of a Notice of Demand.

(d)      Upon the occurrence of any Insolvency Event, all of the Loans, all interest accrued thereon and all other Obligations shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind (including, without limitation, Notice of Demand), all of which are hereby expressly waived by the Credit Parties.

(e)      The Borrower may prepay the principal amount of the Loans outstanding at any time, together with all accrued and unpaid interest thereon, in whole or in part, without premium or penalty thereon or prior notice thereof, provided that no partial prepayment may be made that causes the remaining unpaid principal balance of any Loan (other than an Interest Coverage Loan) to be less than $25,000, or that causes the remaining unpaid principal balance of any LIBOR Rate Loan to be less than $100,000 and further provided that any LIBOR Rate Loan that is repaid on any date other than the last day of the applicable Interest Period shall be accompanied by the prepayment fee described in the next Section.

(f)      All payments by the Credit Parties hereunder shall be paid in full without set-off or counterclaim or without any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes.

(g)      Whenever any payment hereunder shall be stated to be due on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall in such case be included in the computation of the payment of interest. All payments received on a day which is not a Banking Day will be applied to the credit of the Borrower on the next Banking Day.

(h)      Each payment by the Borrower will be made in U.S. Dollars and, if so elected by the Borrower, in immediately available funds by direct debit to a deposit account as specified below or, if the Borrower has not

9

elected to make payments by direct debit, by mail to the address shown on the Borrower's statement or at one of the Bank's banking centers in the United States.

(i)     If the box is checked authorizing automatic debit in the Preliminary Statements above and if the Borrower has not subsequently terminated such authorization, the Borrower expressly agrees that (i) repayments of Loans, accrued interest, and other Obligations due and payable hereunder, will be withdrawn from the Disbursement and Debit Account with the Bank set forth in the Preliminary Statements or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account"), and (ii) the Bank will debit the Designated Account on the date each payment of principal and interest and any other Obligation from the Borrower becomes due (the "Due Date"). If direct debit is in effect, the Borrower will maintain sufficient funds in the Designated Account to cover each debit. If there are insufficient funds in the Designated Account on the date the Bank enters any debit authorized by this Agreement, the Bank may reverse the debit. The Borrower may terminate any previously authorized direct debit arrangement at any time by sending written notice to the Bank at the address specified at the end of this Agreement.

(j)     Prior to each Due Date, the Bank will mail to the Borrower a statement of the amounts that will be due on that Due Date (the "Billed Amount"). The bill will be mailed a specified number of calendar days prior to the Due Date, which number of days will be mutually agreed from time to time by the Bank and the Borrower. The calculations in the bill will be made on the assumption that no new Loans or payments will be made between the date of the billing statement and the Due Date, and that there will be no changes in the applicable interest rate.

(k)     The Billed Amount will be due on the applicable Due Date regardless of the actual amount due on that date (the "Accrued Amount"), and such amount, if paid by mail, shall be paid on or prior to such date or if paid by debit, shall be debited on such date, in each case, in accordance with the other provisions of this Agreement. If the Billed Amount differs from the Accrued Amount, the discrepancy will be treated as follows:

(i) If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the discrepancy. The Borrower will not be in default by reason of any such discrepancy.

(ii) If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the discrepancy.

Regardless of any such discrepancy, interest will continue to accrue based on the actual amount of principal outstanding without compounding. The Bank will not pay the Borrower interest on any overpayment. The Bank may, in its sole discretion, accept a direct debit arrangement from any other Credit Party or other Person on the terms and conditions set forth in this Section 2.7 or as otherwise agreed to in writing by Bank.

SECTION 2.8.  Prepayment of LIBOR Rate Loans.     Each repayment of a LIBOR Rate Loan that is not made on the last day of the Interest Period for such LIBOR Rate Loan, regardless of whether such payment is voluntary, a result of a Notice of Demand, an Insolvency Event or otherwise, shall be accompanied, to the extent permitted by applicable Law, by an amount sufficient to compensate the Bank for any loss, cost or expense incurred by it as a result of the prepayment, including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Credit Parties shall also pay any customary administrative fees charged by the Bank in connection with the foregoing. For purposes of this Section, the Bank shall be deemed to have funded each Loan by a matching deposit or other borrowing in the applicable interbank market, whether or not such Loan was in fact so funded.

SECTION 2.9.  Computations.  All computations of interest shall be made by the Bank on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable. This results in more interest than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid. Each determination by the Bank of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. The last day of each Interest Period and the actual days during each such

10

Interest Period will be determined by the Bank using the practices of the London interbank market. In case of immediately successive Interest Periods applicable to a Loan, each successive Interest Period shall commence on the day the next preceding Interest Period expires.

SECTION 2.10. **Funding Authorization, Bank's Right to Require Written Confirmation.** The Bank may honor telephone or telefax or other written or electronic communication instructions for Notices of Borrowings, Notices of Continuations or other instructions regarding the Loans or this Agreement given, or purported to be given, by any Credit Party or by any one of the individuals authorized to sign loan documents on behalf of any Credit Party, or any other individual designated by any one of such authorized signers; provided that, the Bank may request written confirmation of any such direction from the Borrower or any other Credit Party. The Bank shall be entitled to rely conclusively on such individual's authority to request, convert or continue such Loans until the Bank receives written notice to the contrary. The Bank shall have no duty to verify the authenticity of the signature on any written Notice of Borrowing (and/or Notice of Conversion or Continuation) and, with respect to an oral request for such a Loan (or a conversion or continuation), to the extent that the Bank has relied upon such oral request, the Bank shall have no duty to verify the identity of any Person representing himself/herself as the Borrower or as one of the officers, managers, members, partners, trustees, employees, or other individuals authorized to make such request on behalf of the Borrower. The Credit Parties will indemnify and hold the Bank harmless from all liability, loss, and costs in connection with any act resulting from telephone or telefax or other written or electronic communication instructions the Bank reasonably believes are made by the Borrower, any other Credit Party or by any individual authorized by the Borrower or any other Credit Party to give such instructions. This Section will survive this Agreement's termination, and will benefit the Bank and its officers, employees, and agents. All telephonic communications with the Bank may be recorded by the Bank and each of the Credit Parties consents to such recording. If there is more than one Borrower, any Borrower (or Person or Persons authorized by one of the Borrowers), acting alone, can borrow up to the Maximum Amount of the Facility and each Borrower shall be liable for all extensions of credit made under this Agreement to any other Borrower.

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES

SECTION 3.1. **Representations and Warranties of the Credit Parties.** The Credit Parties make the following representations and warranties, all of which shall (i) survive the execution and delivery of this Agreement and each other Loan Document and (ii) be deemed to be repeated on the date of each Loan:

(a) Authority. The Credit Parties, if other than natural persons, (i) are partnerships, corporations, limited liability companies, trusts or other entities, as set forth in the Preliminary Statements, (ii) are each duly organized, validly existing and, if applicable, in good standing under the Laws of its respective jurisdiction of organization as set forth in the Preliminary Statements and (iii) have the exact legal names as set forth in the Preliminary Statements. Each Credit Party has the requisite power and authority to execute, deliver and perform each of the Loan Documents to which it is a party.

(b) Enforceability. This Agreement and the other Loan Documents to which the Credit Parties are parties, are the legal, valid and binding obligations of the respective Credit Parties party thereto enforceable in accordance with their terms, except as such enforceability may be limited by (i) bankruptcy, insolvency or similar Laws affecting creditors' rights generally and (ii) general principles of equity.

(c) No Conflict. No Credit Party's execution, delivery or performance of any Loan Document to which it is a party contravenes (i) any document pursuant to which such Credit Party, if not a natural person, is organized or governed, (ii) any requirement of Law or (iii) any franchise, license, permit, indenture, contract,

lease, agreement, instrument or other commitment to which such Credit Party is a party or by which such Credit Party or any of its Properties are bound. The execution, delivery and performance of the Loan Documents by the Credit Parties will not result in the imposition of any liens upon any Properties of the Credit Parties, except in favor of the Bank.

(d) **Consents and Filings.** No consent, authorization or filing is required in connection with the execution, delivery and performance of this Agreement or any other Loan Document, except those that have been obtained or made.

(e) **Solvency.** The fair saleable value of the assets (after giving effect to all rights of subrogation, indemnification and contribution and each Loan and the application of proceeds therefrom) of each Credit Party, considered separately for each such Person, exceeds all of such Credit Party's respective estimated liabilities including, without limitation, those to be incurred pursuant to this Agreement and the other Loan Documents and whether those liabilities are subordinated, unmatured, liquidated or contingent. None of the Credit Parties, considered separately, (i) has unreasonably small capital in relation to the respective business in which it is or proposes to be engaged, or (ii) has incurred, after giving effect to the transactions contemplated by the Loan Documents and each Loan and the application of proceeds therefrom, debts beyond its ability to pay as such debts become due. No Credit Party intends to, nor believes that it will, incur debts beyond its ability to pay such debts as they become due.

(f) **Accuracy and Completeness of Information.** None of the reports and other information provided in writing by any of the Credit Parties to the Bank, including, without limitation, any questionnaires or applications submitted by the Credit Parties, in connection with the negotiation, preparation or execution of this Agreement or any other Loan Document, contains any untrue statement of a fact material to the credit worthiness of any Credit Party or omits to state a fact that is necessary in order to make the statements contained therein not misleading.

(g) **No Judgments or Litigation.** No judgments, orders, writs or decrees are outstanding against any of the Credit Parties or any of their Affiliates nor is there now pending or, to the best of any Credit Party's knowledge after diligent inquiry, threatened, any litigation, contested claim, investigation, arbitration, or governmental proceeding by or against any of the Credit Parties or any of their Affiliates that (i) could, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, or (ii) purports to affect the legality, validity or enforceability of this Agreement or any other Loan Document or the consummation of the transactions contemplated hereby or thereby.

(h) **Compliance with Law.** None of the Credit Parties or any of their Affiliates has violated or failed to comply with any requirement of Law, which violation or failure to comply could, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(i) **Brokerage Commissions.** No Person is entitled to receive from any of the Credit Parties any brokerage commission, finder's fee or similar fee or payment in connection with the consummation of the transactions contemplated by this Agreement. No brokerage or other fee, commission or compensation is to be paid by the Bank by reason of any act, alleged act or omission of any of the Credit Parties with respect to the transactions contemplated hereby.

(j) **Government Sanctions.** None of the Credit Parties nor any of their respective affiliated entities, nor, to the knowledge of the Credit Parties, any owner, trustee, director, officer, employee, agent, affiliate or representative of any Credit Party (i) is an individual or entity currently the subject of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is any Credit Party located, organized or resident in a country or territory that is the subject of Sanctions, or (ii) will, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

SECTION 3.2. **Additional Representations, Warranties and Covenants.** Each of the Credit Parties makes the additional representations and warranties, if any, set forth, or referred to, in Article 5 (which shall also (i) survive the execution and delivery of this Agreement and each other Loan Document and (ii) be deemed to be repeated on the date of each Loan).

## ARTICLE 4

## [RESERVED]

## ARTICLE 5

## SECURITY INTEREST

SECTION 5.1. **Pledged Collateral.** As security for prompt payment in full of the Obligations when due, the Bank shall have, and each Pledgor hereby irrevocably and unconditionally grants a continuing security interest in, and lien upon, and right of set-off against, and assigns and transfers to the Bank, all Property described under such Pledgor's name on Schedule A attached hereto and incorporated herein, as hereafter amended or supplemented from time to time in accordance with the procedure set forth thereon, including, without limitation, all Property described on a "Pledge Certificate" (as defined in, and delivered pursuant to, Schedule A) bearing its name. The parties hereto expressly agree that all rights, assets and Property at any time held in or credited to any securities account constituting Pledged Collateral shall be treated as financial assets as defined in the Code. For the avoidance of doubt, each of the Credit Parties and the Bank acknowledge and agree that the provisions of this Article 5 and the other terms and provisions of this Agreement constitute a "security agreement" for purposes of the Code and for all other purposes. Pledgor shall execute and deliver a Form U-1 to the Bank in connection with this Agreement and shall cause such form to be updated as requested by Bank and as required by law.

SECTION 5.2. **Exercise of Rights by Pledgor.** So long as no Notice of Demand is outstanding and no Insolvency Event shall have occurred each Pledgor shall be entitled to exercise all voting and other consensual rights pertaining to the Pledged Collateral beneficially owned by such Pledgor or any part thereof for any purpose not inconsistent with the terms of this Agreement or any other Loan Document; provided, however, that upon any Notice of Demand or any Insolvency Event, at the option of the Bank, upon notice to Pledgor, all rights of Pledgor to exercise the voting and other consensual rights to which it would otherwise be entitled to exercise pursuant to the foregoing provision shall cease, and the Bank shall thereupon have the sole right to exercise such voting and other consensual rights.

SECTION 5.3. **Compliance with Laws, etc.** So long as any of the Obligations under this Agreement shall remain unpaid, each Pledgor: (i) will comply in all material respects with all requirements of Law, applicable to the Pledged Collateral, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and charges imposed upon Pledgor or the Pledgor's Property by any Governmental Authority, except to the extent contested in good faith and by appropriate proceedings; and (ii) will not create or suffer to exist any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to the Pledged Collateral, other than liens in favor of the Bank.

SECTION 5.4. **Bank's Rights to Liquidate Pledged Collateral.** Immediately upon any demand for payment under this Agreement, including, without limitation, pursuant to a Notice of Demand, or upon any Insolvency Event, the Bank shall have the right to sell or otherwise dispose of, or to cause any agent acting on its behalf hereunder (including any sub-custodian) to sell or otherwise dispose of, in accordance with this Section, such of the Pledged Collateral selected by the Bank in its sole discretion. In the event Bank exercises its rights pursuant to this Section, it shall apply the proceeds thereof to the Obligations then due and payable to the Bank under this Agreement, which proceeds shall be applied by the Bank to the Obligations in such order as it may see fit. Each Credit Party agrees that (i) Bank shall have the right to sell any of the Pledged Collateral without any notice, unless expressly required by applicable Law. Such right shall include, but not necessarily be limited to,

the right to sell such Pledged Collateral without notice if there is a recognizable market therefor; (ii) in the event that notice is necessary or required by applicable Law, notice to the applicable Pledgor, given in the manner provided in the provisions of Article 8 of this Agreement for notices three (3) Banking Days prior to the date of public sale of Pledged Collateral or prior to the date after which private sale or any other disposition of Pledged Collateral will be made shall constitute reasonable notice; and (iii) without precluding any other methods of sale or other disposition, the sale or disposition of Pledged Collateral shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of banks disposing of similar property, but in any event, the Bank may sell or otherwise dispose of Pledged Collateral at its option, on such terms as it may choose without assuming any credit risk and without obligation to advertise. If, in the opinion of the Bank, there is any question that a public sale or distribution of any Pledged Collateral will violate any securities Law, the Bank may offer and sell such Pledged Collateral in a transaction exempt from registration under securities Law, and any such sale made in good faith by the Bank shall be deemed "commercially reasonable."

The Credit Parties understand and agree that sales or other dispositions by the Bank of all or portions of the Pledged Collateral may be affected by the Bank at times and in manners designed to address the Bank's credit concerns pursuant to this Agreement and such sales or other dispositions could result in materially less proceeds or more adverse tax consequences than if such sales or other dispositions had occurred at different times or in different manners.

SECTION 5.5. **No Impairment.** All rights of the Bank and liens of the Bank shall continue unimpaired, and the Credit Parties shall be and remain bound by the Obligations and in accordance with the terms hereof, notwithstanding the release of any of the Pledged Collateral, or of any rights or interests therein, or any delay, extension of time, renewal, compromise or other indulgence granted by the Bank in reference to any of the Obligations, or any promissory note, draft, bill of exchange or other instrument or other obligations given in connection therewith or constituting a part of the Pledged Collateral; each Credit Party hereby waiving all notice of any such delay, extension, release, substitution, renewal, compromise or other indulgence, and hereby consenting to be bound thereby as fully and effectually as if each Credit Party had expressly agreed thereto in advance.

SECTION 5.6. **Certain Transfers.** After a Notice of Demand or the occurrence of an Insolvency Event, the Bank may, at its option and without obligation to do so, transfer to or register in its name or the name of its nominee(s), all or any part of the Pledged Collateral with or without notice to any Credit Party and regardless of whether demand for payment of any of the Obligations has been made.

SECTION 5.7. **Authority to File Documents.** The Bank is authorized, at its option, to file in any jurisdiction any initial financing statements and amendments thereto that indicates collateral as any of the Pledged Collateral and contains any other information required for the sufficiency, or filing office acceptance, of any financing statement or amendment. Each Pledgor agrees to take any other action reasonably requested by Bank to insure the attachment, perfection and first priority of, and the ability of the Bank to enforce, the Bank's security interest in any and all of the Pledged Collateral, including, without limitation, executing such instruments, documents and papers which the Bank may request for such purpose.

SECTION 5.8. **Attorney-in-Fact.** The Bank is irrevocably appointed the attorney-in-fact of each Credit Party with full authority in the place and stead of such Credit Party, and in the name of such Credit Party, in the Bank's name or otherwise, from time to time in the Bank's discretion, to take any action and to execute any instrument, document or agreement (including, without limitation, stock powers, financing statements, amendments thereto and continuation statements) which the Bank may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to perfect, preserve and protect the security interest granted or purported to be granted hereunder, to exercise its rights with respect to subordination of obligations to such Credit Party by other Credit Parties and the liquidation of Pledged Collateral contained elsewhere in this Agreement and any of the other Loan Documents, and to deposit any Property received with respect to any Pledged Collateral into the Pledged Accounts of the applicable Pledgor; and each Credit Party agrees to pay the Bank on demand any expenses with respect thereto. Subject to the provisions contained elsewhere in this Agreement regarding the imposition of the Default Rate, any outstanding amount of such expenses shall bear interest from the date incurred until paid to Bank as if such amount were a Loan bearing interest at the Daily Floating Rate. The foregoing appointments are irrevocable and coupled with an interest and

14

shall survive the death or disability of Pledgor and shall not be revoked without the Bank's written consent. To the extent permitted by applicable Law, Pledgor hereby ratifies all said attorney-in-fact shall lawfully do by virtue hereof.

SECTION 5.9. **No Impairment of Right to Demand Payment by Bank.** Nothing contained herein shall limit or otherwise affect in any way the right of the Bank to require, in accordance with the terms hereof, payment of any or all of the outstanding amount of the Obligations on demand at any time.

SECTION 5.10. **Special Covenants Regarding Legal Status.** Each of the Credit Parties will not change its principal place of business and, if applicable, its primary residence as set forth in the Preliminary Statements, without furnishing to Bank at least thirty (30) days prior written notice thereof. Each of the Credit Parties, that is not a natural person, also will not:

(a) allow its corporate or other legal existence to be other than duly organized, valid and, if applicable, in good standing under the Laws of its respective jurisdiction set forth in the Preliminary Statements;

(b) dissolve or liquidate, or merge, convert or consolidate with or into any other Person, without the prior written consent of Bank;

(c) change its name without furnishing to Bank at least thirty (30) days prior written notice thereof; or

(d) utilize any trade name not set forth in the Preliminary Statements without furnishing to Bank at least thirty (30) days prior written notice thereof.

SECTION 5.11. **Additional Covenants with Respect to the Pledged Collateral and the Credit Parties.** Each Pledgor hereby represents and warrants as follows:

(a) that all of the Property constituting Pledged Collateral is owned solely by the respective Pledgor thereof, whose name appears immediately above the description of or reference to such Pledged Collateral in Schedule A or in a "Pledge Certificate," as defined in, and delivered pursuant to, Schedule A, free and clear of any and all liens other than in favor of the Bank;

(b) there are no documents with respect to the Pledged Collateral filed in any jurisdiction naming any Pledgor as the debtor and a Person other than Bank as a secured party;

(c) the security interests granted pursuant to this Agreement constitute valid and enforceable first, prior liens on the Pledged Collateral, which liens, will be perfected upon entering into this Agreement and the Control Agreement, if any;

(d) none of the Pledged Collateral constitutes "restricted securities", as such term is defined in Rule 144 of the Securities Act of 1933, as amended (the "Act"), or is subject to any restriction pursuant to Rule 145 of the Act, and no Credit Party is an "affiliate" of any Issuer thereof, as such term is defined in Rule 144 of the Act;

(e) neither the pledge, foreclosure or sale upon foreclosure of any of the Pledged Collateral, nor the exercise of any of Bank's other rights with respect to the liquidation of such Pledged Collateral contained in any Loan Document is limited by contract, by the policies of any Person, including, without limitation, the Issuer of securities included in the Pledged Collateral or any other requirement of Law;

(f) no Pledgor is a party to any agreement or contract with respect to the Pledged Collateral, except the Loan Documents, nor is any Pledgor subject to any agreements or contracts, except the Loan Documents, that could result in the creation of a lien or other charge or encumbrance upon or with respect to the Pledged Collateral; and

(g) all of the non-cash Pledged Collateral has been fully paid and non-assessable.

15

Each of the Credit Parties hereby affirms each of the representations, warranties and covenants made by any such Credit Party in the Schedules attached hereto and made part of this Agreement.

SECTION 5.12. **Maintenance of Pledged Collateral.** The Credit Parties understand and acknowledge that: (a) it is their obligation to maintain Pledged Collateral with sufficient value to support the outstanding Obligations; (b) the Bank shall determine the value of the Pledged Collateral and the amount required to support the outstanding Obligations, in the Bank's sole and absolute discretion; (c) any such determination made by the Bank, may be modified in the Bank's opinion as circumstances warrant, and (d) any notification from the Bank (with the express understanding that no such notice is required) that the Pledged Collateral has an insufficient value shall be deemed to be a Notice of Demand hereunder. The Credit Parties acknowledge and understand that their compliance with the foregoing maintenance requirements shall not limit in any way the Bank's discretion to demand payment of any or all of the Obligations at any time or to refuse to extend Loans.

SECTION 5.13 **Obligations of Married Persons.** If Pledgor is a married person living in a community property state, Pledgor hereby confirms that Pledgor is acting on behalf of Pledgor's marital community, that the pledge benefits or is expected to benefit the marital community and is intended to bind Pledgor's separate and community property and that no signature of Pledgor's spouse which has not been obtained is required to create a valid pledge hereunder.

## ARTICLE 6

### MISCELLANEOUS

SECTION 6.1. **Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, or consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 6.2. **Notices, Effectiveness.** Unless otherwise provided in this Agreement with or in another agreement between the Bank and the Credit Parties, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, if to a Credit Party, to its address set forth in the Preliminary Statements, and if to the Bank, to its address set forth on the signature page of this Agreement, or sent by facsimile to the respective fax numbers set forth in the Preliminary Statements or listed on the signature page, or to such other addresses or fax numbers as the Bank and the Credit Parties may specify from time to time in writing. Notices and other communications sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day after deposit with the overnight courier, (c) other methods of hand-delivery (including telegram, lettergram or mailgram) shall be deemed delivered when delivered, and (d) facsimile shall be deemed delivered when transmitted. To the extent that oral notification is provided for or agreed to herein, such oral notification may be made by telephone to any of the number(s) set forth in the Preliminary Statements or as set forth in the Bank's records for any Credit Party; provided that any oral notification in person or at any other telephone number shall constitute notification hereunder.

SECTION 6.3. **No Waiver or Limitations; Remedies.** No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. Nothing herein shall be deemed to limit Bank's right to demand payment of a Loan at any time. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

### SECTION 6.4. Costs, Expenses.

(a) Each Credit Party agrees to pay, on demand by Bank, the costs and expenses of the Bank in connection with the closing of the Loan, including the preparation, execution, delivery and administration of the Loan Documents and the fees and expenses of the Bank. Each Credit Party also agrees to pay, on demand by Bank, the costs and expenses of the Bank with respect to (i) the perfection, protection or preservation of rights or

Interests, under the Loan Documents, (ii) any modification or amendment of the Loan Documents, (iii) negotiations with the Credit Party or with other creditors of the Credit Party or any of its Affiliates arising out of any default in performance by any Credit Party hereunder or with respect to presenting claims in or otherwise participating in or monitoring any matter arising out of or in connection with an Insolvency Event, and (iv) the enforcement of the Loan Documents, whether in any action, suit, litigation, matter arising out of or in connection with an Insolvency Event or otherwise, in each case, including, without limitation, the fees and expenses of counsel and other professionals for the Bank with respect thereto. For the avoidance of doubt, and without limiting the generality of the foregoing, such costs and expenses shall include, without limitation, attorneys' fees, related or incidental to the care, holding, retaking, preparing for sale, selling or collection of or realization upon any of the Pledged Collateral or relating or incidental to the establishment or preserving or enforcement of the rights of the Bank hereunder or in respect of any of the Pledged Collateral, and obtaining legal advice as to any of the foregoing, including, without limitation, all actions taken in accordance with this Agreement with respect to filing of financing statements and amendments thereto or otherwise to ensure the attachment of a first priority security interest in the Pledged Collateral. Subject to the provisions regarding the imposition of the Default Rate, any outstanding amounts of such expenses shall bear interest, from the date incurred until paid to Bank, as if such amounts were Prime Rate Loans.

(b) Each Credit Party agrees to indemnify and hold harmless the Bank and each of its Affiliates and its officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against, and to reimburse each Indemnified Party, upon its demand, for, any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and expenses of counsel and other professionals) that may be incurred by or asserted or awarded against any Indemnified Party or to which any Indemnified Party may become subject, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with this Agreement, any other Loan Document, any document or instrument delivered in connection herewith, or the transactions contemplated hereby, or any Loan, whether or not such investigation, litigation or proceeding is brought by any Credit Party or its directors, shareholders, trustees or creditors or an Indemnified Party or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Each Credit Party also agrees that no Indemnified Party shall have any liability to any Credit Party for special, indirect, consequential or punitive damages arising out of or otherwise relating to any of the transactions contemplated herein or in any other Loan Document or the actual or proposed use of the proceeds of the Loans, except for damages to the extent determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. No Credit Party shall interpose any defense to the payment of the Obligations based upon any statute of limitations. No provision in this Agreement or in any of the other Loan Documents and no course of dealing among the parties shall be deemed to create any fiduciary duty by the Bank to any Credit Party.

(c) If any Credit Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and Indemnities, such amount may be paid on behalf of such Credit Party by the Bank, in its sole discretion, and any amount so paid by Bank shall be immediately reimbursed to it by the Credit Parties and, subject to the provisions regarding the imposition of the Default Rate, shall bear interest, from the date so paid by Bank until repaid by the Credit Parties to Bank as if such amount were a Loan bearing interest at the Daily Floating Rate.

(d) Each Credit Party agrees that its obligations under this Section shall survive termination of the Agreement.

**SECTION 6.5.** **Binding Effect**. This Agreement shall become effective when it shall have been executed by each of the Credit Parties and Bank and thereafter shall be binding upon and inure to the benefit of each Credit Party and the Bank and their respective successors and assigns, except that no Credit Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Bank.

**SECTION 6.6.** **Successors and Assigns**. This Agreement is binding on the Credit Parties and the Bank's successors and assignees. The Credit Parties agree that they may not assign this Agreement without the

17

Bank's prior consent. The Bank may sell participations in or assign this Agreement and the Loans, and may exchange information about the Credit Parties with actual or potential participants or assignees. If a participation is sold or a Loan is assigned, the purchaser will have the right of set-off against the Credit Parties. If Bank assigns or transfers its rights under this Agreement, and if Bank or any of its Affiliates is a securities intermediary (as referred to in the Code) for any or all of the Pledged Collateral the Pledgor agrees that the Bank in such capacity, is irrevocably directed by the Pledgor to comply with instructions or entitlement orders with respect to such Pledged Collateral originated by any assignee or transferee of this Agreement without further consent from the Pledgor.

SECTION 6.7. **Execution in Counterparts; Telecopied Signatures.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed original counterpart of this Agreement.

SECTION 6.8. **Exercise of Rights by Bank; Rights of Set-Off.** In addition to any rights now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, the Bank and each of its Affiliates are hereby authorized by each of the Credit Parties at any time and from time to time, if the Bank has made a demand for payment under this Agreement, or if any Credit Party is not in compliance with any of the terms of this Agreement that have not been waived by the Bank, or if an Insolvency Event has occurred, to the fullest extent permitted by Law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) then held by, and other indebtedness then owing to, the Bank or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations now or hereafter existing under this Agreement which have been demanded or are otherwise due. The Bank shall promptly notify the applicable Credit Party after any such setoff and application; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 6.9. **Maximum Rate.** Notwithstanding anything to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Credit Parties and the Bank hereby agree that all agreements between them under this Agreement and the other Loan Documents, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever shall the amount paid, or agreed to be paid, to the Bank for the use, forbearance or detention of the money loaned to the Borrower and evidenced hereby or thereby, or for the performance or payment of any Obligation contained herein or therein, exceed the Highest Lawful Rate. If due to any circumstance whatsoever, fulfillment of any provisions of this Agreement or any other Loan Document at the time performance of such provision shall be due shall exceed the Highest Lawful Rate, then, automatically, the Obligation to be fulfilled shall be modified or reduced to the extent necessary to limit such interest to the Highest Lawful Rate, and if from any such circumstance the Bank should ever receive anything of value deemed interest by applicable Law which would exceed the Highest Lawful Rate, such excessive interest shall be applied to the reduction of the principal amount then outstanding hereunder or on account of any other then outstanding Obligations and not to the payment of interest. All sums paid or agreed to be paid to the Bank for the use, forbearance or detention of the Obligations, to the extent permitted by applicable Law, shall be amortized, prorated, allocated and spread throughout the full term thereof, until payment in full thereof, so that the actual rate of interest on account of the Obligations does not exceed the Highest Lawful Rate throughout the entire term thereof. If, after giving effect to the preceding terms of this Section, any Credit Party has paid interest in excess of the Highest Lawful Rate, such excess shall be refunded to such Credit Party. The terms and provisions of this Section shall control over every other provision of this Agreement, the other Loan Documents, and all other agreements between the Credit Parties and the Bank.

SECTION 6.10. **Severability.** Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

SECTION 6.11. **Joint and Several Liability.** Except as expressly provided herein, every Person signing this Agreement as a Credit Party agrees to be, jointly and severally, fully and personally responsible for the full

18

payment of all amounts due hereunder and the performance of all other promises and obligations made in this Agreement.

SECTION 6.12. **Dispute Resolution.** This Section, including the subsections below, is referred to as the "Dispute Resolution Provision." The Bank, the Credit Parties (and any other party subject to this Agreement) agree that this Dispute Resolution Provision is a material inducement for the parties entering into this Agreement.

(a)     This Dispute Resolution Provision concerns the resolution of any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses (individually or collectively, a "Claim" or "Claims") between the Bank, on the one hand, and the Credit Parties, or any of them, on the other hand (each side being, for the purposes of this Dispute Resolution Provision, a "Party" and the two sides together being the "Parties"), regardless of whether based on federal, state, local or foreign law, statute, ordinance, regulation, contract, tort, common law, or any other source, and regardless of whether foreseen or unforeseen, suspected or unsuspected, or fixed or contingent at the time of this Agreement, including but not limited to Claims that arise out of or relate to: (i) this Agreement (including any renewals, extensions or modifications); or (ii) any document related to this Agreement. For the purposes of this Dispute Resolution Provision only, the terms "Bank" or Party or Parties (to the extent referring to or including the Bank) shall include any parent corporation, subsidiary or affiliate of the Bank.

(b)     Any Claim brought by any Party in a California state court shall be resolved by a general reference to a referee (or a panel of referees) as provided in California Code of Civil Procedure Section 638, unless such reference is rejected, not enforced, or is otherwise unavailable. The referee (or presiding referee of the panel) shall be a retired Judge or Justice of the California state court system. The referee(s) shall be selected by mutual written agreement of the parties. If the parties do not agree, the referee(s) shall be selected by the Presiding Judge of the Court (or his or her representative) as provided in California Code of Civil Procedure Section 640. The referee(s) shall hear and determine all issues relating to the Claim, whether of fact or of law, and shall do so in accordance with the laws of the Governing Law State and the California rules of evidence and civil procedure, and shall report a statement of decision. The referee(s) shall be empowered to enter equitable as well as legal relief, provide all temporary or provisional remedies, enter equitable and legal orders that will be binding on the parties, and rule on any motion which would be authorized in court litigation, including without limitation motions to dismiss, for summary judgment, or for summary adjudication. The referee(s) shall award legal fees and costs (including the fees of the referee(s)) relating to the judicial reference proceeding, and to any related litigation or arbitration, in accordance with the terms of this Agreement. The award that results from the decision of the referee(s) shall be entered as a judgment in the court that appointed the referee(s), in accordance with the provisions of California Code of Civil Procedure Sections 644(a). Pursuant to California Code of Civil Procedure Sections 645, the parties reserve the right to seek appellate review of any judgment or order, including but not limited to, orders pertaining to class certification, to the same extent permitted in a court of law. The Parties agree that judicial reference pursuant to this subsection is the preferred method of dispute resolution of all Claims brought by any Party in a California state court. The Parties therefore agree that injunctive relief, including a temporary restraining order, without the posting of any bond or security, shall be appropriate to enjoin the prosecution of any arbitration proceeding where the Claims at issue are subject to (and as long as they remain subject to) judicial reference pursuant to this subsection, provided that a Party moves for such relief within thirty (30) days of its receipt of a demand for arbitration of such a Claim.

(c)     With the sole exception of Claims subject to reference under Subsection 6.12(b) above, the Parties agree that at the request of any Party to this Agreement, the Claim shall be resolved by binding arbitration in accordance with Subsections 6.12(c)-(m) herein. The Claim shall be governed by the controlling laws as stated in Section 6.13 below. The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "Act"), shall apply (and the Parties stipulate that the arbitration act or chapter of any individual state shall not apply) to the construction, interpretation, and enforcement of this Dispute Resolution Provision, as well as to the confirmation of or appeal from any arbitration award. Provided, however, that if any of the Credit Parties are non-U.S. residents or otherwise have contacts or assets such that the Bank may desire to enforce an arbitration award outside of the U.S., then the "New York Arbitration Convention" (the Convention on the Recognition and Enforcement of Foreign Arbitral Awards) shall apply to the extent necessary, including with regard to the confirmation of and appeal from any award.

(d)     Arbitration proceedings will be determined in accordance with the Act, the then-current Commercial Financial rules and procedures of the American Arbitration Association or any successor thereof ("AAA") (or any successor rules for arbitration of financial services disputes), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. The arbitration shall be administered by the Parties and the arbitrator(s) and not by the AAA and shall be conducted, unless otherwise required by law, at a location selected solely by the Bank in any U.S. state where real or tangible personal property collateral for this credit is located or where any of the Credit Parties has a residence or place of business. If there is no such state, the Bank shall select a location in the state specified in Section 6.13 below. Each of the Credit Parties agrees that it shall be deemed to have received proper notice (including pursuant to the Act or the New York Arbitration Convention, as applicable) with respect to any part of the arbitration proceeding if it has received notice pursuant to the Notices provision of this Agreement.

(e)     (i) The arbitrator(s) will be selected pursuant to the AAA "Arbitrator Select: List and Appointment" process, to be initiated by the Bank with an initial request for a list of 10 arbitrators. If the Credit Parties fail to execute the submission forms, they authorize the Bank and its representatives to execute the forms on their behalf. If the AAA "Arbitrator Select: List and Appointment" process is unavailable, the Bank shall initiate any successor process offered by the AAA or a similar process offered by any other nationally recognized alternative dispute resolution organization.

(ii) A Party shall be entitled to take no more than five (5) fact depositions, one or more of which may be taken in accordance with Fed. R. Civ. P. 30(b)(6), plus depositions of any experts designated by the other Party, each of seven (7) hours or less, during pre-hearing discovery. The arbitrator(s) shall enforce the "Apex" doctrine with regard to requested depositions of high-ranking executives of the Bank.

(iii) There shall be no written discovery requests except a Party may serve document requests on the other Party not to exceed thirty (30) in number, including subparts. The requests shall be served within forty-five (45) days of the appointment of the arbitrator(s) and shall be responded to within twenty-one (21) days of service.

(f)     The arbitrator(s) shall consider and rule on motions by the Parties to dismiss for failure to state a claim; to compel; and for summary judgment, in a manner substantively consistent with the corresponding Federal Rules of Civil Procedure. The arbitrator(s) will give effect to the limitations on causes of action and damages against the Bank as stated in Subsection 6.4(b) above. In addition, the arbitrator(s) will give effect to applicable statutes of limitation in determining any Claim (except Claims by the Bank for payment of the Obligations (see Subsection 6.4(b) above)) and shall dismiss the Claim if it is barred by the statutes of limitation.

(g)     The arbitrator(s) shall have the power to award legal fees and costs relating to the arbitration proceeding and any related litigation or arbitration, pursuant to the terms of this Agreement including Section 6.4 above, with credit allowed for any such costs previously paid by the respective party or parties. The arbitrator(s) shall provide a written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(h)     This Dispute Resolution Provision does not limit the right of any Party to: (i) exercise self-help remedies, such as, but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(i)     Subject to Subsections 6.12(b) and 6.12(h) above, if any Party fails to demand arbitration of Claims within ninety (90) days after the filing of the court action involving those Claims, such failure shall be a waiver of the right to arbitration.

(j)     The arbitration proceedings shall be private. All documents, transcripts, and filings received by any Party shall not be disclosed by the recipient to any third parties other than to affiliates or to attorneys, accountants, auditors, and financial advisors acting in the course of their representation, or as otherwise ordered

by a court of competent jurisdiction or required by law, rule or regulation. Any settlement or award also shall be kept confidential, except to the extent required to submit it to a court for confirmation or to pursue enforcement. The Parties agree that injunctive relief, including a temporary restraining order, from a trial court is the appropriate relief for breach of this paragraph, and they waive any security or the posting of a bond as a requirement for obtaining such relief. Notwithstanding the foregoing, nothing in this Agreement shall prohibit any of the parties from disclosing any award, settlement, arbitration proceedings, or underlying facts and circumstances in response to an inquiry by a self-regulatory organization or regulatory or government agency.

(k)     Any arbitration or trial by a judge or referee of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). **THE CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.** Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The Parties acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the Parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the Parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **THE PARTIES ACKNOWLEDGE AND AGREE THAT UNDER NO CIRCUMSTANCES WILL A CLASS ACTION BE ARBITRATED.**

(l)     By agreeing to binding reference or arbitration herein, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties, to the extent permitted by applicable Law irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. To the extent permitted by applicable Law, this waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. **WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE OR REFEREE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY APPLICABLE LAW.**

(m)     Each of the Credit Parties expressly and irrevocably waives any rights to commence any action, suit, or other dispute resolution procedure against the Bank arising out of or relating to this Agreement except in accordance with this Dispute Resolution Provision. Each of the Loan Parties also agrees that any action, suit, or other dispute resolution procedure commenced by it in violation of this Dispute Resolution Provision shall at the request of the Bank be subject to immediate dismissal by the presiding judge, tribunal, or administrative body and/or referral to arbitration hereunder (pursuant to the Act or the New York Arbitration Convention, as applicable). In any proceeding filed in accordance with this Dispute Resolution Provision, each of the Credit Parties expressly and irrevocably consents to personal jurisdiction and venue in such forum selected by the Bank; and waives any and all rights to contest jurisdiction and venue and the convenience of any such forum including any and all rights to remove such action to a different forum.

SECTION 6.13. **GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, FEDERAL LAW, AND, TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PROVISIONS THEREOF.

SECTION 6.14. **FINAL AGREEMENT.** (a)     THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

(b)     THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(c)     FOR THE AVOIDANCE OF DOUBT, THE OBLIGATIONS WILL NOT BE EVIDENCED SEPARATELY BY A PROMISSORY NOTE OR NOTES.

SECTION 6.15. STATE SPECIFIC DISCLOSURES.

| STATE SPECIFIC DISCLOSURES FOR INDIVIDUALS RESIDING IN AND/OR ENTITIES OR TRUSTS LOCATED OR ORGANIZED UNDER THE STATE INDICATED BELOW, AS APPLICABLE ||
|---|---|
| Connecticut | <u>APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS:</u> EACH CREDIT PARTY EXPRESSLY ACKNOWLEDGES THAT THE CREDIT AGREEMENT AND EACH TRANSACTION RELATED TO IT IS A "COMMERCIAL TRANSACTION" WITHIN THE MEANING OF CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. EACH CREDIT PARTY HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ANY AND ALL RIGHTS WHICH ARE OR MAY BE CONFERRED UPON IT UNDER CHAPTER 903a OF SAID STATUTES (OR ANY OTHER FEDERAL OR STATE LAW AFFECTING PREJUDGMENT REMEDIES) TO ANY NOTICE OR HEARING OR PRIOR COURT ORDER OR THE POSTING OF A BOND PRIOR TO BANK'S OBTAINING A PREJUDGMENT REMEDY. EACH CREDIT PARTY ACKNOWLEDGES THAT HE/SHE OR IT, AS THE CASE MAY BE, HAS BEEN ADVISED BY COUNSEL OF ITS CHOICE OR HAS HAD THE OPPORTUNITY TO RETAIN COUNSEL OF ITS CHOICE WITH RESPECT TO THIS TRANSACTION AND THE CREDIT AGREEMENT. |
| Iowa | IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THE CREDIT AGREEMENT (TOGETHER WITH THE EXHIBITS AND SCHEDULES HERETO) SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THE CREDIT AGREEMENT MAY BE LEGALLY ENFORCED. BANK MAY CHANGE THE TERMS OF THE CREDIT AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT. |
| Missouri | <u>APPLICABLE TO CREDIT PARTIES ENTERING INTO CONSUMER PURPOSE TRANSACTIONS:</u> ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT. |
| Missouri | <u>APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS:</u> ORAL *OR UNEXECUTED* AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT. |
| New Mexico | <u>APPLICABLE TO CREDIT PARTIES ENTERING INTO COMMERCIAL PURPOSE TRANSACTIONS:</u> EACH CREDIT PARTY WHO SIGNS BELOW ACKNOWLEDGES THE PROVISIONS OF SECTION 58-6-5 NMSA 1973 COMP., WHICH REQUIRE A CONTRACT, PROMISE, OR COMMITMENT TO LOAN MONEY, OR TO GRANT, EXTEND, OR RENEW CREDIT, OR ANY MODIFICATION THEREOF, IN AN AMOUNT GREATER THAN TWENTY FIVE THOUSAND DOLLARS ($25,000), NOT PRIMARILY FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES, TO BE IN WRITING AND SIGNED BY THE PARTY TO BE CHARGED OR THAT PARTY'S AUTHORIZED REPRESENTATIVE. |
| North | NO COMMERCIAL LOAN COMMITMENT FOR A LOAN IN EXCESS OF FIFTY THOUSAND |

| Carolina | DOLLARS ($50,000) SHALL BE BINDING UNLESS THE COMMITMENT IS IN WRITING AND SIGNED BY THE PARTY TO BE BOUND. THE TERM "COMMERCIAL LOAN COMMITMENT" MEANS AN OFFER, AGREEMENT, COMMITMENT, OR CONTRACT TO EXTEND CREDIT PRIMARILY FOR BUSINESS OR COMMERCIAL PURPOSES AND DOES NOT INCLUDE CHARGE OR CREDIT CARD ACCOUNTS, PERSONAL LINES OF CREDIT, OVERDRAFTS, OR ANY OTHER CONSUMER ACCOUNT. |
|---|---|
| Ohio | THE OHIO LAWS AGAINST DISCRIMINATION REQUIRE THAT ALL CREDITORS MAKE CREDIT EQUALLY AVAILABLE TO ALL CREDIT WORTHY CUSTOMERS, AND THAT CREDIT REPORTING AGENCIES MAINTAIN SEPARATE CREDIT HISTORIES ON EACH INDIVIDUAL UPON REQUEST. THE OHIO CIVIL RIGHTS COMMISSION ADMINISTERS COMPLIANCE WITH THIS LAW. |
| Oregon | UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY THE BANK CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY ANY DEBTOR'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY THE CREDIT PARTY TO BE ENFORCEABLE. DO NOT SIGN THIS APPLICATION AND AGREE TO THE TERMS IN THIS CREDIT AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO BEFORE READING IT. THE CREDIT AGREEMENT PROVIDES FOR THE PAYMENT OF A BREAKAGE FEE PENALTY IF A CREDIT PARTY WISHES TO REPAY A LIBOR RATE LOAN PRIOR TO THE DATE PROVIDED FOR SUCH REPAYMENT IN THE CREDIT AGREEMENT. |
| South Dakota | ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER SOUTH DAKOTA LAW. |
| Texas and Louisiana | THIS CREDIT AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. |
| Vermont | THIS IS A DEMAND LOAN AND SO MAY BE COLLECTED BY THE BANK AT ANY TIME. A NEW LOAN MUTUALLY AGREED UPON AND SUBSEQUENTLY ISSUED MAY CARRY A HIGHER OR LOWER RATE OF INTEREST. |
| Washington | ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW. |

[Signatures on the following page]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal, or caused this Agreement to be executed under seal by their respective duly authorized officers as of the date first above written.

BORROWER/PLEDGOR:

_____(Seal)
Mashiyat Rashid

_____(Seal)
Saima Rashid


BANK:

BANK OF AMERICA, N.A.

By:_____(Seal)
Name: Ahmed Siaje
Title:   Managing Director

Address where notices to the Bank are to be sent:

Charlotte – Attn:  Notice Desk
One Bank of America Center
NC1-028-27-05
150 N. College St.
Charlotte, NC 28255

*Federal law requires Bank of America, N.A. (the "Bank") to provide the following three notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.*

### (1) USA PATRIOT ACT NOTICE

Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. The Bank will ask for the Borrower's legal name, address, tax ID number or social security number and other identifying information. The Bank may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of the Borrower, guarantors or other related persons.

*Notices #2 and #3 apply only to individual Borrowers or Guarantors and individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank ("Obligors"):*

### (2) AFFILIATE SHARING NOTICE

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #3 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank toll-free at 888.341.5000, (2) visiting the Bank online at bankofamerica.com/privacy, or (3) contacting the Obligor's client manager or local financial center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

### (3) AFFILIATE MARKETING NOTICE -- YOUR CHOICE TO LIMIT MARKETING

- The Bank of America companies listed below are providing this notice #3.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

25

- You may tell us your choice to limit marketing offers, and you may tell us the choices for other customers who are joint account holders with you.

- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.

- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:

Bank of America
Banc of America
U.S. Trust
LandSafe
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies. In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.
BAL Solar I, LLC
BAL Solar II, LLC
BAL Solar III, LLC

28

Exhibit 6



# CLAIM FORM

## YOU MUST COMPLETE <u>ALL</u> PARTS OF THIS FORM FOR THE ASSETS YOU ARE CLAIMING.

**Note**: There is no legal form or format required for filing a claim; this document is provided for your convenience. Please visit https://www.forfeiture.gov/FilingClaim.htm for more specific guidance on filing your claim with the appropriate seizing agency.

**Frivolous Claim Statement**:  If a court finds that a claimant's assertion of an interest in property was frivolous, the court may impose a civil fine. Title 18 United States Code, Subsection 983(h). A false statement or claim may subject a person to criminal prosecution under Title 18 United States Code, Sections 1001 and 1621.

**Privacy Act Notice**:  The Department of Justice is collecting this information for the purpose of processing your claim. Providing this information is voluntary; however, the information is necessary to process your application. Information collected is covered by Privacy Act System of Records Notice Department of Justice (DOJ), DOJ-002-DOJ Computer Systems Activity & Access Records, Federal Register (71 FR 29170). This information may be disclosed to contractors when necessary to accomplish an agency function, to law enforcement when there is a violation or potential violation of law, or in accordance with other published routine uses. For a complete list of routine uses, see the system of records notice listed above.

## SECTION I – CONTACT INFORMATION

| CLAIMANT INFORMATION |
|---|

| **Claimant/Contact Name**: (Last, First) |
|---|
| Charles J. Taunt, Chapter 7 Trustee for the Estate of Saima M. Rashid |

| **Business/Institution Name**: (if applicable) | **Prisoner ID**: (if applicable) |
|---|---|
| | |

| **Address**: (Include Street, City, State, and Zip Code) |
|---|
| 700 E. Maple Rd., 2nd Floor |
| Birmingham, MI 48009 |

**Address**: (Include Street, City, State, and Zip Code)
700 E. Maple Rd., 2nd Floor
Birmingham, MI 48009

**Social Security Number/Tax Identification Number**: (Enter N/A if you do not have one)
███2348

**Please provide an explanation why you do not have a Social Security Number, if above is N/A:**

**Phone**: (optional)
248-644-7800 | **Email**: (optional)

| ATTORNEY INFORMATION (if applicable) |
|---|

**Attorney Name**: (Last, First)
Nelson, Dean

**Attorney Title**:

**Firm Name**: (if applicable)
Taunt Law Firm

**Attorney Address**: (Include Street, City, State, and Zip Code)
700 E. Maple Rd., 2nd Floor
Birmingham, MI 48009

**Are you an attorney filing this claim on behalf of your client?   XX YES   ☐ NO**

**Attorney Phone**: (optional)
**248-644-7800** | **Attorney Email**: (optional)
dnelson@tauntlaw.com

*If any of this information changes, you are responsible for notifying the agency of the new information.*


## SECTION II – ASSET LIST

*List each asset ID and asset description that you are claiming.*

| # | Asset ID | Asset Description |
|---|---|---|
| 1 | 17-FBI-005339 | All Funds on Deposit and All Other Items of Value from E*Trade IRA Account No. ███0075 ($25,568.16) |
| 2 | 17-FBI-005344 | All Funds on Deposit and All Other Items of Value in U.S. Trust-Bank of America Private Wealth Management Account No. ███████4026 ($6,764,801.27) |
| 3 | 17-FBI-005355 | $64,680.04 in funds from Bank of America Account No. ██████3302 |
| 4 | 17-FBI-005356 | $3,650,413.21 in funds from Bank of America Money Market Savings Account No. ███████8653 |
| 5 | 17-FBI-006090 | $508,400.00 U.S. Currency |

## SECTION III – INTEREST IN PROPERTY

*Identify your interest in each of the assets you are claiming. If you are filing for multiple assets and the responses are not the same for each asset, please print out multiple copies of this page to submit with the claim. If you have documentation that supports your interest in the claimed assets (e.g., bill of sale, retail installment agreements, contracts, titles or mortgages), please include copies of the documents with the submission of the claim.*

| INTEREST IN PROPERTY INFORMATION | |
|---|---|
| **Asset ID** | **Asset Description** |
| | **See Assets Listed Above.** |
| | |

**In the space below, please explain why you have a valid, good faith, and legally recognizable interest in this asset**:

For each of the Assets seized in connection to case criminal case No. 17-20465 (E.D. MI), Charles J. Taunt has an interest in the assets in his capacity as the Chapter 7 Trustee for the Bankruptcy Estate of Saima M. Rashid, Case No. 18-46255-MAR (Bankr. ED MI).

Saima M. Rashid is the spouse of Mashiyat Rashid, the criminal defendant in case No. 17-20465 (E.D. MI).  Mrs. Rashid had an interest in each of the assets identified above at the time she filed a bankruptcy petition (4/27/18).  As such, her interest in the assets are property of her bankruptcy estate pursuant to 11 U.S.C. §541.  A copy of the Notice of Bankruptcy Filing is attached, identifying all pertinent information about the bankruptcy case, including Mr. Taunt's appointment as Trustee.

Mrs. Rashid had an interest in each of the assets for the reasons described below.  As to each of the accounts she was a 50% joint title holder on the accounts.  See attached documentation.

As to the 508,400.00 U.S. Currency asset, $500,000 of these funds were seized, upon information and belief, immediately after they were withdrawn from Bank of America Account #8653 (a joint account).  A copy of the account statement identifying this withdrawal is attached.

Finally, the Trustee has a good faith belief that the source of the funds seized by the government, at least in part, are the proceeds of a loan from Bank of America, of which Mrs. Rashid was a joint obligor.  Copies of documents establishing this loan are attached indicating that the loan (a line of credit) proceeds would be deposited to Bank of America Account #3302 (a joint Account).

**In the space below, please list any documents you are including in support of your interest in the asset(s).  If none are included, please explain why.**

Notice of Bankruptcy

Account Statements for all accounts other than E*Trade IRA Account No. 35950075.  The Trustee will provide additional documents as he obtains them.

Documents related to the Bank of America Loan that funded, at least in part, the funds seized by the government.

## SECTION IV – RECOVERY OF LOSS

*Complete this section for assets you have recovered all or a portion of your losses either via an insurance claim and/or via some other source of recovery.  If you have more recovery of loss information than may fit on this page, print out multiple copies of this page to attach with the claim and indicate which assets apply to each page. If you have not received any recovery of your losses, then leave this section blank.*

| RECOVERY OF LOSS INFORMATION | |
|---|---|
| **Asset ID** | **Asset Description** |
| | |
| | |

| INSURANCE CLAIM INFORMATION (if applicable) | |
|---|---|
| **Name of Insured**: (Last, First) | |
| **Policy Number**: | **Claim Number**: |
| **Name of Insurance Company**: | **Name of Insurance Agent**: (Last, First) |
| **Insurance Company Address**: (Include Street, City, State, and Zip Code) | |
| **Phone**: (optional) | **Email**: (optional) |
| **Have you received compensation from the insurance company?**   ☐ YES        ☐ NO | **Amount of Compensation**: |

**If other sources of recovery exist (e.g., restitution, returns on investment or other settlements), please list and describe the details below.**

| OTHER SOURCE(S) OF RECOVERY (if applicable) | |
|---|---|
| **Source of Recovery 1**: | **Amount of Recovery**: |
| **Source of Recovery 2**: | **Amount of Recovery**: |

**In the space below, please list any documents you are including in support of your claim of recovery of loss. If none are included, please explain why.**

## SECTION V – DECLARATION

*The following declaration must be completed by the claimant.*

I attest and declare under penalty of perjury that my claim is not frivolous and the information provided in support of my claim is true and correct to the best of my knowledge and belief.

_____
**Signature**

_Charles J. Taunt, Trustee_
**Printed Name**

_12/21/18_
**Date**

If a court finds that a claimant's assertion of an interest in property was frivolous, the court may impose a civil fine. Title 18 United States Code, Subsection 983(h). A false statement or claim may subject a person to criminal prosecution under Title 18 United States Code, Sections 1001 and 1621.